**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AXSOME THERAPEUTICS, INC. SECURITIES LITIGATION | Case No.: 1:22-cv-3925-LGS |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS
AXSOME THERAPEUTICS INC., HERRIOT TABUTEAU, MARK
JACOBSON, AND KEVIN LALIBERTE'S MOTION TO DISMISS
THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    STATEMENT OF FACTS ...................................................................................... 4

III.   ARGUMENT............................................................................................................ 6

       A.    The Complaint Adequately Alleges a Strong Inference of Scienter ...................... 7

             1.    Defendants' Conscious Misbehavior and Recklessness ............................ 7

             2.    Defendants' Motive to Commit Fraud........................................................ 15

       B.    The Complaint Adequately Alleges False and Misleading Statements ................. 16

             1.    Manufacturing Statements Were False and Misleading ........................... 16

             2.    Statements Concerning the AXS-07 NDA Were False
                   and Misleading................................................................................... 21

             3.    Defendants' Statements Are Not Puffery ................................................. 23

       C.    The Complaint Adequately Alleges Loss Causation ........................................... 24

       D.    The Complaint Adequately Alleges Claims Under Section 20(a) ........................ 25

IV.    CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Teach. Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014). (*See* Mem. )....................................................................23

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990)...........................................................................................................21

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) .......................................................................12, 13

*Christiansen v. Spectrum Pharms.*, *Inc.*,
2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) .................................................................................12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)..........................................................................................................24

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)...........................................................................................10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)..............................................................................................8

*Cohen v. Kitov Pharms. Holds., Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) (Schofield, J.) ................................................24, 25

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).......................................................................................................................24

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................................................24

*Galestan v. OneMain Holds.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)............................................................................................19

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)...........................................................................................................15

*Gauquie v. Albany Molec. Rsch., Inc.*,
2016 WL 4007591 (E.D.N.Y. July 26, 2016) ..........................................................................12, 13

*Glazer v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992)...........................................................................................................21

*Gorlamari v. Verrica Pharms.*,
2024 WL 150341 (E.D. Pa. Jan. 11, 2024) ...............................................................11

*In re Adient*
*plc Sec. Litig.*, 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) .....................................21

*In re Allergan PLC Sec. Litig.*,
2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ..........................................................20

*In re Aratana Theraps. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) .......................................................................19

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) ..........................................................22

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014) (Schofield, J.) ......................................... *passim*

*In re Emergent BioSolutions Inc. Sec. Litig.*,
2023 WL 5671608 (D. Md. Sept. 1, 2023) ...........................................................8, 23

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) .......................................................................18

*In re GPC Biotech AG Sec. Litig.*,
2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009) ...........................................................24

*In re iDreamSky Tech. Sec. Litig.*,
236 F. Supp. 3d 824 (S.D.N.Y. 2017) .......................................................................23

*In re ITT Educ. Servs.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014) .........................................................................11

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) ..............................................................8

*In re Omnicom Grp. Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) (Mem. ) .......................................................................25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................................13, 16

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...........................................................12

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...............................................................................24, 25

*In re WEBMD Health Corp. Sec. Litig.*,
2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...................................................................................19

*In re Y-mAbs Theraps., Inc. Sec. Litig.*,
2024 WL 451691 (S.D.N.Y. Feb. 5, 2024)................................................................................15

*Irvine v. ImClone Sys., Inc.*,
2003 WL 21297285 (S.D.N.Y. June 4, 2003) .....................................................................21, 23

*Kendall v. Odonate Theraps.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ..................................................................... *passim*

*Leung v. bluebird bio, Inc.*,
599 F. Supp. 3d 49, 64-66 (D. Mass. 2022)..............................................................................10

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).................................................................................................7, 25

*Lozada v. TaskUs, Inc.*,
2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ...................................................................................8

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)......................................................................................................6

*Noble Asset Mgmt. v. Allos Theraps.*,
2005 WL 4161977 (D. Colo. Oct. 20, 2005) ...........................................................................21

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).......................................................................................... *passim*

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020)...................................................................17, 19, 22

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
2020 WL 3268531 (S.D.N.Y. June 17, 2020) ..........................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................................................19, 23

*Patel v. L-3 Commc'ns Holds.*,
2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016).............................................................................7

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)..........................................................................................8

*Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015).......................................................................................................7

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .................................................................. *passim*

*Rosi v. Aclaris Theraps., Inc.*,
    2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ........................................................................25

*Schaeffer v. Nabriva Theraps., plc*
    2020 WL 7701463 (S.D.N.Y Apr. 28, 2020).........................................................................12

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ....................................................................................12

*Setzer v. Omega Healthcare Invs.*,
    968 F.3d 204 (2d Cir. 2020)..................................................................................................16

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018)...............................................................................10, 21

*Shash v. Biogen*,
    84 F.4th 1 (1st Cir. 2023).......................................................................................................19

*Sinnathurai v. Novavax*,
    645 F. Supp. 3d 495 (D. Md. 2022) ................................................................................ *passim*

*Stadium Cap. LLC v. Co-Diagnos., Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024).......................................................................13, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................................7

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................................................21

*United Indus. Workers Pen. Plan v. Waste Mgmt.*,
    2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) (Schofield, J.) ....................................11, 15, 19

**Statutes**

Private Securities Litigation Reform Act of 1995 .........................................................................18

**Rules**

Fed. R. Civ. P. 12.............................................................................................................................6

Lead Plaintiffs Thomas Giblin, Paul Berger, and Paul Sutherland ("Plaintiffs") respectfully submit this Memorandum in opposition to the Motion to Dismiss the Second Amended Class Action Complaint (ECF Nos. 79-81) submitted by Defendants Axsome Therapeutics, Inc. ("Axsome" or the "Company"), Herriot Tabuteau, Mark Jacobson, and Kevin Laliberte.[1]

## I.      INTRODUCTION

This case focuses on events during a period spanning May 10, 2021 to April 22, 2022 (the "Class Period"). During that time, Axsome experienced (but concealed) a serious manufacturing problem affecting "AXS-07," a treatment for migraines, that was one of only two products that this small pharmaceutical company planned to commercialize in the near term.

The Complaint advances Plaintiffs' prior allegations "that Axsome experienced significant problems in the manufacturing process for its new drug, AXS-07, and what these problems presaged for the timing and prospect of FDA approval." ECF No. 56 at 9. The Court dismissed the prior complaint for standing issues unrelated to these core allegations, and accepted the premise that "serious manufacturing problems" emerged by the second quarter of 2021. *Id.* at 11. The allegations were based, in part, on CW1, who was "tasked with managing" a study "scheduled to begin in April 2021," but that was delayed because Axsome could not manufacture AXS-07. *Id.*

Adding even more detail from CW1, the Complaint particularizes that Axsome was *entirely unable* to manufacture AXS-07 during the Class Period because of the equipment problems the witness identified. This further supports the strong inference that the Individual Defendants, a discrete group of top managers whose jobs depend on their handling of serious issues,  knew about this major problem. ¶¶ 67-78. Moreover, Axsome's Senior Director of Supply Chain for AXS-07,

---

[1] ¶ _ references are to the Second Amended Class Action Complaint ("Complaint") (ECF No. 76). Defendants' Memo in Support of their Motion (ECF No. 80) is referenced as "Mem." Internal quotations and citations are omitted, and emphases are added, unless noted otherwise.

who told CW1 directly about the manufacturing problems at Axsome's vendor, reported to Defendants Jacobson and Laliberte and provided them updates about the status of Axsome's drug supplies. ¶¶ 70-71. Laliberte also oversaw Axsome's response to an internal audit, during which he discussed the equipment issue at a meeting. ¶¶ 72-73. The Individual Defendants' scienter is also supported because they—and CEO Tabuteau in particular—told the FDA that they were involved in all aspects of the drug development process (including manufacturing, New Drug Applications ("NDAs"), and FDA interactions), and they demonstrated their knowledge of manufacturing issues related to AXS-07 by discussing them in detail. Axsome was a small company, with only 60 employees at the start of the Class Period and only a few drug candidates. AXS-07 was one of only two drugs that contributed to Axsome's value in any significant way.

The Complaint details why Axsome's inability to manufacture AXS-07 during the Class Period posed such a problem for its crucial NDA. Defendants Tabuteau and Jacobson discussed before the Class Period that Axsome needed to "manufacture additional batches" of AXS-07 to obtain more "long-term stability data" for the NDA, which they categorized as "manufacturing information." ¶¶ 85-86. Then, after the FDA rejected the NDA because of issues related "to the drug product and manufacturing process," the unexpected news emerged that the resubmission of the NDA would need to "include new CMC [chemistry, manufacturing, and controls] information, including stability data on newly manufactured commercial scale batches of AXS-07." No quick fix was on the horizon: this all would take a year to obtain and "cannot be sped up." ¶¶ 87, 90-92.

The only logical inference—and certainly a strong one—from all of this information is that the Individual Defendants knew during the Class Period that Axsome was unable to manufacture AXS-07 because of equipment problems, that this would significantly delay their ability to obtain the additional stability data that they planned on including in the NDA, and that this posed a serious

2

risk that the NDA would be delayed or rejected. That is exactly what happened when the FDA required the NDA to be resubmitted with stability data on more batches of the drug.

Defendants' response mischaracterizes the Complaint, misstates the law, and defies common sense. They contend that they are immune from liability because they merely expressed opinions about the likelihood of FDA approval. (Mem. at 1). The Complaint is clear, however, that Defendants made misstatements by affirmatively discussing manufacturing issues related to AXS-07 while failing to mention that Axsome was completely unable to manufacture the drug at the time. Defendants also misled investors about the status of the NDA by describing it positively while omitting the manufacturing problems that posed a significant risk of delay or rejection by the FDA. It was materially misleading for Defendants to promote AXS-07's manufacturing status and its NDA while omitting the material CMC problems that plagued the development of AXS-07 to the point that Axsome could not manufacture the drug while its NDA was under review.

Moreover, Defendants argue with Plaintiffs' well-pled allegations by suggesting that the Individual Defendants did not know about the manufacturing problem that CW1 identified. In support of this farfetched position, Defendants misstate the law by criticizing CW1 for not having had direct "contact with the Individual Defendants." (Mem. at 11). This ignores the actual legal standard that asks whether there is a "probability" that CW1 "would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The specificity of CW1's account and their connection to the manufacturing problem exceeds this standard and leaves no doubt that CW1 more than "probably" had this important information.

Similarly, Defendants fight the facts by positing an alternative scenario in which the CMC issue that CW1 identified was not the concern that "caused the FDA to reject the" NDA. (Mem. at 12, 24). This evidence-based argument must await another day. Plaintiffs' more-than-plausible

inference follows directly from Defendants' stark admission that the FDA required "additional CMC data" related to the "manufacturing process" (¶ 58), including stability data on new batches of AXS-07 that Axsome was completely unable to manufacture. Defendants' argument is doubly deficient, as they do not even offer an alternative explanation for the FDA's rejection, hiding instead behind the fact that "the CRL is not public" because Axsome chose not to disclose it. (Mem. at 12). Defendants simply invite the Court to accept their premature affirmative defense.

Lastly, Defendants distract from the core facts by arguing based on their stock holdings that they did not have any motive to commit fraud. Defendants, however, mischaracterize their *passive* receipt of stock options and RSUs from an unknowing Compensation Committee as if they were the equivalent of an affirmative purchase of Axsome stock. (*See* Opposition to Pizzie & O'Gorman Motion to Dismiss at 10-14). Moreover, Defendants ignore binding authority that motive need not be pled in the face of strong evidence of conscious misbehavior and recklessness.

In sum, Defendants do not seriously counter CW1's detailed explanation of how Axsome could not manufacture AXS-07 during the Class Period. This allegation must be accepted as true at this stage and will be easily verified in discovery. The Complaint also strongly supports the inference that Axsome's top executives knew of this significant issue as it dragged on for months, yet misrepresented the manufacturing status of AXS-07 and level of risk this posed for its NDA.

## II.   STATEMENT OF FACTS

Axsome develops therapies for central nervous system ("CNS") disorders. ¶ 2. The first two NDAs that Axsome submitted to the FDA were for AXS-05 and AXS-07. ¶ 29. Axsome's ability to obtain approval for and commercialize these therapies was critical to its operations and potential financial success because they were part of its "core CNS portfolio." ¶¶ 27-28, 31.

CMCs are an integral part of a drug's development and FDA approval. ¶ 59. Companies

4

must demonstrate the manufacturing process produces a consistent product at scale. ¶¶ 3, 59, 61, 88. Axsome uses independent contract manufacturing organizations ("CMOs") to manufacture its drugs. ¶ 32. During the Class Period, Axsome kept its investors in the dark regarding significant manufacturing problems at a CMO responsible for manufacturing AXS-07. ¶¶ 4, 69-76.

Axsome submitted its NDA for AXS-07 in June 2021, months after the initial deadline, because it needed to add "supplemental manufacturing information to ensure a robust submission package." ¶¶ 47, 49-50, 102-03, 110. Then, on April 25, 2022, Defendants stunned the market by announcing that the FDA was rejecting the NDA for AXS-07 due to "unresolved"—and previously undisclosed—CMC issues, resulting in a stock price decline of almost 22%. ¶¶ 53-56.

Although the FDA's rejection shocked the market, it could not have surprised Defendants, who knew about the manufacturing delay, and the impact that would have on the AXS-07 NDA. CW1, a former Axsome Senior Clinical Trial Manager, was tasked in early 2021 to manage a study for AXS-07 scheduled for April 2021. ¶ 69. The study was delayed because Axsome did not have sufficient supply of AXS-07 for the study, as its CMO was unable to manufacture the drug due to equipment problems for the entire time the study was delayed. ¶¶ 69-70. The study remained delayed when CW1 left Axsome in February 2022, only a few weeks prior to the end of the Class Period. ¶ 74. CW1 learned this information from Fang Liu, Axsome's Senior Director of Supply Chain for AXS-07, who reported to Defendants Jacobson and Laliberte. ¶ 71. CW1 explained that, as the point person for the supply of AXS-07, Liu dealt with the supply delay due to the equipment issues and updated Jacobson and Laliberte about the status of drug supplies. ¶ 71.

Furthermore, these equipment problems were raised in an internal audit of Axsome's manufacturing facilities in the summer of 2021. ¶ 72. Laliberte was directly involved in Axsome's response to the audit and discussed Axsome's equipment issues at an internal meeting. ¶ 73.

5

CW1 stated this delay affected the entire supply of AXS-07, not just batches that were for use in trials. ¶ 76. This comports with Defendant Tabuteau's statement that the manufacturer of Axsome's "clinical trial supply" was "the same CMO that we're using for commercial production." ¶ 99. The inability to produce AXS-07 thus meant that Axsome was completely unable to produce the drug prior to its NDA submission and while the NDA was under review.

The Individual Defendants' knowledge of Axsome's inability to manufacture AXS-07 is further supported by: their telling the FDA of their specific roles in the manufacturing and FDA approval processes (¶¶ 173-77); the FDA alerting Axsome during the Class Period of CMC issues that remained "unresolved" as of April 22, 2022 (¶¶ 53, 56, 171); Tabuteau, Jacobson, and Laliberte's discussions before, during, and after the Class Period of manufacturing issues related to AXS-07 (¶¶ 62-66, 81, 85-86, 90-92, 134, 142-43, 168-70); the persistent nature of CMC issues plaguing Axsome, including with AXS-05 (¶¶ 112-16, 120-22, 172); and CW1's observation that leadership put profits over patients, "cut corners," and rushed to meet milestones (¶¶ 89, 104).

All of this information together shows that: (i) Defendants knew prior to submitting the AXS-07 NDA that Axsome needed to "manufacture additional batches" in order to obtain additional stability data for the NDA (¶¶ 85-86); (ii) by the start of the Class Period, Axsome was completely unable to manufacture AXS-07; (iii) obtaining stability data takes a full year even after batches are ready to be tested; and (iv) the FDA raised manufacturing issues concerning AXS-07 during the Class Period that remained "unresolved" when it rejected the NDA. ¶¶ 109-10.

## III.    ARGUMENT

When reviewing a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).

6

**A.**     **The Complaint Adequately Alleges a Strong Inference of Scienter**

A complaint adequately pleads scienter where "*all* of the facts alleged, taken collectively," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007), support a strong inference (a) that "defendants had both motive and opportunity to commit fraud" *or* (b) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. "[A]ccess to information suggesting . . . statements were not accurate" suffices to plead recklessness. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). No "smoking gun" is necessary—allegations suffice where the inference is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

The Complaint adequately alleges Axsome's scienter based on the Individual Defendants' scienter, as well as that of "management-level employees" that knew of the problems with manufacturing AXS-07 while Axsome made false and misleading statements on that topic, regardless of whether those employees "made the material misstatements at issue." *Patel v. L-3 Commc'ns Holds.*, 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015).

**1.**     **Defendants' Conscious Misbehavior and Recklessness**

Defendants' conscious misbehavior and recklessness is adequately alleged by several independent factors showing they knew of or recklessly disregarded the equipment problems that made Axsome entirely unable to manufacture AXS-07 during the Class Period.

***First***, CW1 made clear that Axsome's Senior Director of Supply Chain for AXS-07 knew the full extent of the equipment problem and updated Defendants Jacobson and Laliberte about the status of drug supplies. ¶ 71. Moreover, Laliberte discussed the equipment issue at a meeting in

the summer of 2021, during Axsome's response to an internal audit. ¶¶ 72-73; *supra* at 5.[2]

Defendants respond that "CW1 is not alleged to have had any personal contact with any Individual

Defendant." (Mem. at 2, 10-11). That misstates the law because "there is no baseline requirement"

that a witness have had contact with a defendant. *Plumbers & Pipefitters Nat'l Pension Fund v.*

*Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015) (holding CW probably knew of

defendants' involvement in sales practices based on CW's position); *In re Emergent BioSolutions*

*Inc. Sec. Litig.*, 2023 WL 5671608, at \*21 (D. Md. Sept. 1, 2023) (crediting CWs who "do not

allege that they personally informed the Individual Defendants of all the problems").[3] Rather, a

witness's allegations must be stated "with sufficient particularity to support the probability that"

this individual "would possess the information." *Novak*, 216 F.3d at 314; *see also Sinnathurai v.*

*Novavax*, 645 F. Supp. 3d 495, 526 (D. Md. 2022) (crediting CW allegations "that the relevant

information generally flowed to senior company officials"). Courts determine whether a person in

the witness's position would have the knowledge that they describe based on context. *See City of*

*Warren Police & Fire Ret. Sys. v. World Wrestling Ent.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020)

(holding "hearsay and indirect knowledge" should be credited when it is "probable" the witness

"would have had access to" the information); *Lozada v. TaskUs, Inc.*, 2024 WL 68571, at \*25

(S.D.N.Y. Jan. 5, 2024) (same); *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*5–6 (W.D.

Pa. May 18, 2023) (crediting "low-level former employees" described with particularity regarding

---

[2] This inference is even further supported by CW1's assessment that Axsome's executive management would have known about the equipment problem and that they prioritized profit over patients, "cut corners," and were always in a rush to meet milestones, as well as CW1's reporting to senior managers. ¶¶ 78, 89, 174, 178-80, 183-84.

[3] Defendants' cases, in contrast, dealt with CWs that had far less specific knowledge. (Mem. at 8-11 (citing *In re Weight Watchers Int'l Sec. Litig.*, 2016 WL 2757760, at \*6-7 (S.D.N.Y. May 11, 2016) (CWs were "not in a position to know" information at issue); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at \*7 (S.D.N.Y. Dec. 16, 2014) (Schofield, J.) (CWs had no contact with company employees); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352, 358 (S.D.N.Y. 2011) (vague allegations omitted the region of a large bank that CW supervised); *Glaser v. The9*, 772 F. Supp. 2d 573, 594-95 (S.D.N.Y. 2011) (CWs did not work for the company); *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 162 (1st Cir. 2019) (CWs were "several levels removed from" executive team); *In re Hain Celestial Grp.*, 2022 WL 18859055, at \*28 (E.D.N.Y. Nov. 4, 2022) (accounts were "bereft of particulars")).

widespread production issues). The Complaint—and common sense—strongly support the inference that CW1 possessed the information alleged because CW1 was a Senior Clinical Trial Manager who managed a trial for AXS-07, discussed the manufacturing problem with a senior manager who was in charge of the supply of AXS-07 and updated Jacobson and Laliberte on that issue, and described a specific meeting where Laliberte discussed the issue. ¶¶ 67-78.

*Second*, scienter is properly inferred where an individual defendant made decisions concerning the topic at issue. *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (Schofield, J.) (denying dismissal, ruling complaint pled scienter based on CW allegation that "all decisions came from" the CEO). The Individual Defendants **admitted to the FDA that they were involved in making decisions concerning CMC issues and Axsome's NDA filings.** These activities, by definition, exposed them to the manufacturing problems that plagued AXS-07 to the point that the Company was not able to produce the drug while the NDA was under submission. In particular, Defendant Tabuteau told the FDA that he is "the most responsible person" for the Company and was "involved[d] in almost every aspect associated with the development, implementation, and realization of" Axsome's "drug development projects," including "product development and regulatory strategies," "Clinical development and clinical trial outlook and implementation," "Protocol development," "NDA filings," and "Oversight [of] all company departments and personnel." ¶¶ 173-74; Declaration of Michael Grunfeld (filed herewith) ("Grunfeld Decl."), Ex. 1. Laliberte was responsible for "chemistry manufacturing and controls," "Quality assurance/product strategy," and "research and operations." ¶¶ 174-76. Jacobson was responsible for "Operations." ¶ 174.[4] Given these admissions to the FDA—as well

---

[4] The FDA report detailing these tasks related to an inspection for AXS-05 (*see* Mem. at 12), but there is no reason why Defendants' responsibilities, which they described in relation to the Company as a whole, would have changed for AXS-07. ¶¶ 173-76. Moreover, Axsome filed the AXS-07 NDA during the same time period, and AXS-07 and AXS-05 were the first two drugs for which Axsome submitted NDAs. ¶¶ 29, 50-51, 119-27.

as CW3's description of Axsome's leadership as "extremely secretive" about FDA interactions (¶ 185)—the Complaint raises a strong inference that the Individual Defendants knew, or were at least willfully blind as to, the manufacturing issues with AXS-07. *See Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (holding "evidence depicting Defendants' central roles in" drug development and NDA "drafting" supports scienter); *Novavax*, 645 F. Supp. 3d at 526; *Delcath Sys.*, 36 F. Supp. 3d at 335.

While the core operations doctrine applies (*infra* at 13; Mem. at 12-13), these allegations based on Defendants' detailed descriptions to the FDA of their day-to-day jobs during the drug manufacturing and approval process particularize their actual control over the very processes involved in their misstatements, supporting their scienter.[5] *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) (finding scienter supported by repeated statements about company's "extensive structure for risk monitoring").

***Third***, the FDA's identification during the NDA review process of manufacturing problems with AXS-07 further supports a strong inference of scienter. *See Delcath Sys.*, 36 F. Supp. 3d at 335. During its review, the FDA warned that Axsome had manufacturing problems with AXS-07, which remained "unresolved" as of April 22, 2022. ¶¶ 53, 56, 171. Defendants respond, nonsensically, that "'unresolved' was Axsome's word, not the FDA's" (Mem. at 15), but do not explain how, even if true, that would alter the plain meaning of this statement that the FDA

---

[5] Defendants' cases are inapposite because they did not provide a strong basis to infer the defendants were unaware of the underlying information at issue. (Mem. at 12-14 (citing *Woodley v. Wood*, 2022 WL 103563, at *10 (S.D.N.Y. Jan. 11, 2022) (rejecting argument that restatement itself is evidence of scienter); *In re EHang Holds. Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 465 (S.D.N.Y. 2022) (plaintiffs did not "allege facts that independently" support scienter); *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 64-66 (D. Mass. 2022) (plaintiff failed to allege any statements indicating defendants' knowledge); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) (addressing falsity without ruling on scienter); *In re The Hain Celestial Grp. Inc. Sec. Litig.*, 2019 WL 1429560, at *14, *17 (E.D.N.Y. Mar. 29, 2019) (underlying channel stuffing not adequately alleged); *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (plaintiffs failed to show defendants "actually possessed information contradicting their" statements); *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019) (plaintiff did not explain what contradictory facts should be imputed to defendants))).

"identified" the CMC issues during its Class Period "review of the Company's" NDA. ¶ 53.

Defendants argue Plaintiffs do not allege when this discussion with the FDA occurred. (Mem. at 15). But it is cogent, and at least as compelling, that "unresolved" means the FDA communicated this issue before March 1, 2022 (the date of the last alleged misstatements (¶¶ 150-56)), which was less than two months earlier and after the NDA was pending for nine months. *See In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 310 (S.D.N.Y. 2014) (holding the court need not "identify the precise moment at which the culpable inference overtook the innocent one").

Defendants are also wrong that they lack scienter because the manufacturing problems with AXS-07 could have been remedied. (Mem. at 11, 15). Even if the issues were resolved, Axsome would have needed an additional year to obtain the required stability data on new batches that did not exist at the time. ¶¶ 90-92. Jacobson referenced stability data for 12 months as one of the data points typically provided "with respect to CMC," which "cannot be sped up." ¶ 91. That alone would take Axsome past its PDUFA date of April 30, 2022. ¶¶ 2, 51, 53, 114. *See United Indus. Workers Pen. Plan v. Waste Mgmt.*, 2024 WL 1312593, at *7 (S.D.N.Y. Mar. 27, 2024) (Schofield, J.) (rejecting defendants' argument that they were "entitled to devote a reasonable amount of time to investigation and remediation"). Moreover, whether Axsome could have resolved the issues is irrelevant because Defendants misrepresented persistent manufacturing issues that were a significant problem in and of themselves, and therefore material to AXS-07's **prospects** for FDA approval. ¶¶ 69-70. Defendants were, at the very least, severely reckless in making repeated, positive statements about the manufacturing of AXS-07 and its NDA while omitting that Axsome was completely unable to produce the drug at the time. *See Gorlamari v. Verrica Pharms.*, 2024 WL 150341, at *7-8, *10 (E.D. Pa. Jan. 11, 2024) (scienter adequately alleged where interim FDA

11

feedback "would inhibit, rather than facilitate, timely approval").[6]

*Fourth*, Defendants' "public statements evinc[ing] familiarity with the data" at issue supports a strong inference of scienter. *Delcath Sys.*, 36 F. Supp. 3d at 335; *see also Busic v. Orphazyme A/S*, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022) (same); *Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at *16 (S.D.N.Y. Jan. 23, 2024) (scienter adequately alleged where executive "repeatedly spoke to investors about pozi's development and the FDA review process, suggesting" his awareness of relevant information); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (defendants' statements about "CMC issues" supported the inference that they "had access to the information"); *Gauquie v. Albany Molec. Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (communications about issue supports the inference that defendants knew contradictory information); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (comments confirm "intimate knowledge of the data"). In response to analysts' questions about the manufacturing of AXS-07, Tabuteau, Jacobson, and Laliberte discussed the need to "manufacture additional batches" for the NDA, "the manufacturing process for AXS-07," and the year-long timeline to obtain "stability data on new batches," indicating they knew of any material problems related to that issue. ¶¶ 62-66, 81, 85-86, 90-92, 134, 142-43, 168-70; *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (attempts to placate analyst concerns support scienter).[7]

Defendants note certain of these statements, related to the time needed to obtain stability data, came after the Class Period. (Mem. at 16). But such "[p]re-class" and "post-class period data

---

[6] In *Schaeffer v. Nabriva Theraps. plc*, 2020 WL 7701463, at *10, *13 (S.D.N.Y. Apr. 28, 2020) (Mem. at 11, 15), plaintiffs did not plead enough facts to make their account of "the extent of the cGMP issues plausible."

[7] The one case cited by Defendants on this point is inapposite. (Mem. at 15 (citing *Hou Liu v. Intercept Pharms., Inc.*, 2020 WL 1489831, at *15-16 (S.D.N.Y. Mar. 26, 2020) (lacking particularized facts as to when or how the individual defendants learned about the adverse events)).

may be relevant to . . . what a defendant knew or should have known during the class period." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73, 76 (2d Cir. 2001).[8] Moreover, the time needed to conduct stability studies was only part of the problem. At the start of the Class Period, Axsome's timeline for making a complete NDA submission was doubly delayed because even if it were able to resolve its indefinite manufacturing halt (which it did not during the Class Period), the Company would still need to first start lengthy stability studies on new batches of AXS-07.

*Fifth*, AXS-07 was essential to Axsome's operations and finances, supporting the inference of scienter under the "core-operations doctrine," which "reflects the commonsense assumption that executives are likely to know more about things central to their business." *Stadium Cap. LLC v. Co-Diagnos., Inc.*, 2024 WL 456745, at \*5 (S.D.N.Y. Feb. 5, 2024). Indeed, AXS-07 was part of Axsome's "core CNS portfolio" of five therapies, only the second NDA it submitted, and one of only two drugs that contributed any significant value to the Company. ¶¶ 27, 29, 31, 187. The Individual Defendants were Axsome's most senior executives responsible for drug development and thus should have known about the CMC issues with AXS-07. That was particularly the case because Axsome had *only 60 full-time employees* as of February 22, 2021. ¶ 18. These types of allegations suffice, especially as to the top executives of pharmaceutical companies. *See Acadia Pharms.*, 2016 WL 5076147, at \*9 (finding "absurd" that senior executives did not know of issues given importance of drug and role of manufacturing); *Orphazyme*, 2022 WL 3299843, at \*22-23 (finding it "unlikely that" CEO and CMO were "unaware" of FDA communications about "sole drug candidate"); *Novavax*, 645 F. Supp. 3d at 526; *Gauquie,* 2016 WL 4007591, at \*2.

Defendants confuse the issue by arguing not that they did not know of Axsome's complete

---

[8] The cases cited by Defendants are inapposite (Mem. at 16 (citing *Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at \*8 (S.D.N.Y. May 6, 2013) (finding absence of any adverse information known to defendants); *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 426 n.3 (S.D.N.Y. 2023) (same); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 352 n.32 (W.D.N.Y. 2008) (post-class period letter did not show statements at issue were false)).

inability to manufacture AXS-07 during the Class Period, but that those issues were not the reason for the FDA's rejection of the NDA. (Mem. at 12). But arguing with the well-pled allegations in the Complaint is for a later stage. Furthermore, even if debate on this issue was appropriate now, the connection is clear from Defendants' concession of the need to "manufacture additional batches" to obtain "long-term stability data" for the NDA, as well as their subsequent admission that the FDA required Axsome to resubmit the NDA because it required "stability data on newly manufactured commercial scale batches of AXS-07." ¶¶ 85-86, 90-92, 109-10. While CW1 left Axsome in February 2022 (just before the end of the Class Period), it is reasonable to infer that the equipment problems persisted when, on April 22, 2022, issues with AXS-07 were still "unresolved" because of "CMC data pertaining to the drug product and manufacturing process." ¶¶ 53, 56-58, 74, 77. Defendants do not even offer a competing inference. Plaintiffs' inference that the FDA rejected the initial AXS-07 NDA because Axsome could not obtain that data as a result of its inability to manufacture new batches of the drug is thus at least as compelling as Defendants' assertion that the FDA rejected the NDA for some unnamed reason that they fail to disclose.

Similarly, Defendants challenge not their knowledge, but CW1's underlying description of the inability to manufacture AXS-07, asserting that the FDA would have noticed the issue during an inspection. (Mem. at 13). This argument does not make sense because, as Defendants concede, the FDA inspection "related to AXS-05," not AXS-07 (Mem. at 12); ¶ 173 n.14. There is no reason why the FDA would have exceeded the scope of this inspection to review an entirely separate product that it was not prepared to evaluate. Moreover, Axsome used multiple facilities for different stages of manufacturing AXS-07, only one of which was the AXS-05 facility. ¶¶ 34, 75, 83, 134.[9] Defendants do not provide a compelling reason to doubt CW1's express statement that

_____

[9] Axsome's CMC issues with AXS-05 further support scienter. These issues certainly do not defeat scienter or put the market on notice of the issues with AXS-07 (Mem. at 14-15), because they were different CMC issues and the market

14

the equipment problem at the CMO that combined AXS-07's constituent parts made Axsome completely unable to make any new batches while the problem persisted. *Id.*; *supra* at 5-6.[10]

Contrary to Defendants' unsupported narrative, the SAC *as a whole* supports each Defendant's scienter. Especially in the context of a small pharmaceutical company, a straightforward review of the Complaint creates an inference that is at least as strong as Defendants' denial of culpability as to the severe manufacturing problems afflicting one of Axsome's two primary drug candidates leading up to submission of its NDA and while the NDA was pending. *See In re Y-mAbs Theraps., Inc. Sec. Litig.*, 2024 WL 451691, at *13 (S.D.N.Y. Feb. 5, 2024) (scienter supported because drug was the "lead product candidate," the company was responsible for FDA submissions, and defendants made "detailed statements" on "the progress of the" FDA submission and supervised FDA communications); *Waste Mgmt.*, 2024 WL 1312593, at *7; *Delcath Sys.*, 36 F. Supp. 3d at 335-36 ("allegations taken together" support recklessness).[11]

### 2.      <u>**Defendants' Motive to Commit Fraud**</u>

Where plaintiffs adequately allege conscious misbehavior or recklessness, there is no requirement to assess the defendants' motive at this time. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *Delcath Sys.*, 36 F. Supp. 3d at 334 n.4. Defendants thus cannot rebut a strong inference of scienter by arguing that they had no motive to commit fraud.

Defendants' motive arguments also fail for the independent reasons discussed on pages

---

was plainly surprised that "CMC deficiencies appear to be a persistent issue plaguing the company." ¶¶ 112-16, 172.

[10] Given Plaintiffs' many allegations related specifically to each of the Individual Defendants, the Court should reject out-of-hand Defendants' attempt to cast these allegations as "group pleading." (Mem. at 16).

[11] Defendants' cases, unlike here, dealt with conclusory allegations lacking factual support. (Mem. at 17 (citing, *e.g., Abady v. Lipocine*, 2023 WL 2938210, at *24 (D. Utah Apr. 13, 2023) (complaint failed to connect scienter allegations to alleged misstatements); *Lewakowski v. Aquestive Theraps.*, 2023 WL 2496504, at *12 (D.N.J. Mar. 14, 2023) (plaintiffs did not cite to any CWs to support their claims); *Dresner v. Silverback Theraps.*, 2023 WL 2913755, at *14 (W.D. Wash. Apr. 12, 2023) (scienter argument hinged on a misunderstanding of what a specific term meant); *Paxton v. Provention Bio*, 2022 WL 3098236, at *15-16 (D.N.J. Aug. 4, 2022); *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460-61 (S.D.N.Y. 2019); *In re Aratana Theraps. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018)).

10-14 of the accompanying opposition to Defendants Pizzie and O'Gorman's Motion. Plaintiffs' factual and legal rebuttals there apply with equal force to Tabuteau and Jacobson because the "shares" that they supposedly acquired (Mem. at 2, 7-8) were the same unvested, "unexercised options" or RSUs that followed the same pattern as Pizzie's purported stock "increase." *See* McDonough Decl., Ex. E and Form 4s in Exs. G, H (ECF Nos. 81-5, 81-7, 81-8, 81-9).[12]

**B.      The Complaint Adequately Alleges False and Misleading Statements**

The Complaint alleges that Defendants made misstatements concerning Axsome's (1) manufacturing of AXS-07 and (2) the quality of its NDA. Plaintiffs need not plead "detailed evidentiary matter," *Scholastic*, 252 F.3d at 72, but merely enough facts "to support a reasonable belief" that Defendants' statements were materially false or misleading. *Novak*, 216 F.3d at 314 n.1. All of Defendants' statements meet this standard in light of the manufacturing problems that jeopardized approval of AXS-07 under the NDA that was submitted during the Class Period.

In addition to making material misstatements about CMC issues, once Defendants chose to speak on these topics, they were duty-bound to disclose the CMC problems, in order to avoid giving an "inaccurate, incomplete, or misleading" impression about the status of AXS-07 and its NDA. *Setzer v. Omega Healthcare Invs.*, 968 F.3d 204, 213-14 (2d Cir. 2020); *Stadium Cap. LLC*, 2024 WL 456745, at \*2 (denying dismissal where defendants "put[] the topic 'in play'" by listing factors that one "would expect to prop up sales" without disclosing "sales ha[d] already cratered").

**1.      Manufacturing Statements Were False and Misleading**

Defendants made many statements during the Class Period concerning the manufacturing

---

[12] For example, Tabuteau received 320,516 unvested options and RSUs in early 2022, an astounding 115% increase over the 148,870 options and RSUs granted to him in 2021. Likewise, Jacobson received 179,093 unvested options and RSUs in late 2021 and early 2022, dwarfing the 63,801 in unvested awards he received in early 2021, most of which had lost significant value by early 2022. These new "replacement" awards in 2022 alone were worth $7 million for Tabuteau and $3 million for Jacobson. (Grunfeld Decl. Ex., 2 (2023 Proxy) at 35). Jacobson's late 2021 grants were worth an additional $1.24 million. (Grunfeld Decl., Ex. 3 (2022 Proxy) at 33).

of AXS-07 and the CMC component of the AXS-07 NDA. ¶¶ 130, 132, 134, 136, 138, 142-43, 146, 148, 150, 153, 155. For example, Defendants reassured investors about an FDA inspection of a manufacturing facility for AXS-07 shortly before the drug's PDUFA date. ¶¶ 150. Axsome also disclosed in its annual 10-Ks, and incorporated the statement into its quarterly 10-Qs, that "[w]e believe that our existing suppliers of our product candidate active pharmaceutical ingredients and finished products will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." ¶¶ 96, 132, 138, 148, 153. Similarly, Axsome stated that its "manufacturers" might "fail to produce our product candidates in the volumes that we require on a timely basis," which could lead to "delays in the development and commercialization of" its products or "delays in obtaining sufficient quantities of our product candidates for us to meet commercial demand or to advance our clinical trials." ¶¶ 132, 138, 148, 155.

In addition to being false on their face, these statements were misleading because "when a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading." *Delcath Sys.*, 36 F. Supp. 3d at 332-33 (denying dismissal, ruling defendants may not selectively disclose trial results without "additional facts that would cast those results in a more negative light"); *see also Acadia Pharms.*, 2016 WL 5076147, at *6 (denying dismissal, finding statements about NDA misleading "without mentioning" lack of "meaningful assessment of the manufacturing and quality assurance systems"); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (positive statements about "manufacturing validation runs" were actionable in light of data integrity breach that "could seriously jeopardize" FDA approval); *Novavax*, 645 F. Supp. 3d at 519-20 (statements discussing manufacturing status that "left out another important factor in the delay" were actionable because company "faced significant manufacturing concerns and thus was facing

17

delays"); *Kendall v. Odonate Theraps.*, 2021 WL 3406271, at \*5 (S.D. Cal. Aug. 4, 2021) (omitted information made statements misleading because "undisclosed reality was materially different").

Defendants admitted that Axsome needed to "manufacture additional batches" in order to obtain further "stability data" for its AXS-07 NDA. ¶¶ 85, 90-92, 106, 109-10; *supra* at 2-4, 6, 11-14. CW1 makes clear, however, that during the Class Period, Axsome was completely unable to manufacture any new batches of AXS-07 because of the equipment problems at its CMO. ¶ 76. This fact rendered Defendants' descriptions of the manufacturing process for AXS-07—including those about the ability of its "existing suppliers" to produce AXS-07—false and misleading. Moreover, these problems were already causing "delays in the development and commercialization of" AXS-07 and preventing Axsome from producing "sufficient quantities . . . to meet commercial demand" of the product when Defendants made these statements describing these as only *potential* risks. The Complaint particularizes why each statement was false and misleading, including the fact that by April 2021, Axsome's CMO was unable to produce AXS-07, Axsome was therefore unable to complete stability studies on new batches before it submitted its NDA, and these facts materially increased the likelihood of delaying or preventing FDA approval.

Defendants argue that their statements about the ability of Axsome's suppliers to provide sufficient quantities of AXS-07 are protected forward-looking or statements of opinion. (Mem. at 18-19). But these statements do not qualify for the first prong of the PSLRA safe harbor for forward-looking statements (or the related "bespeaks caution" doctrine), because Defendants have not identified any "meaningful cautionary language" concerning these statements. Indeed, Defendants' purported "risk disclosures" are not only unavailing, but are independently misleading because they "warn[ed] only that a risk may impact [Axsome's] business when that risk ha[d] already materialized." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516

18

(S.D.N.Y. 2013); *see also Waste Mgmt.*, 2024 WL 1312593, at \*5 (holding warning "lists only vague and generic risks" when the Complaint alleges "the risks had already materialized"); *Immunomedics*, 2020 WL 4381924, at \*6 (holding risk disclosure actionable because the "risk had already materialized"); *see also infra* at 22-23 (regarding other asserted risk disclosures).[13]

Defendants' only argument as to the safe harbor's second prong repeats their scienter arguments. (Mem. at 20). Defendants had knowledge of their statements' falsity for the reasons discussed above. (*See supra* at 7-15). Furthermore, the safe harbor "does not protect material omissions," including the omission of CMC problems "that would make the challenged statements misleading." *Galestan v. OneMain Holds.*, 348 F. Supp. 3d 282, 303-04 (S.D.N.Y. 2018).

In addition, Defendants argue that certain of their statements about the capabilities of Axsome's existing suppliers are inactionable statements of opinion. (Mem. at 21). Under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), a statement of opinion is actionable if it: (i) is not sincerely held (*id.* at 184); (ii) contains an embedded fact that is false (*id.* at 185-86); or (iii) omits a fact that renders it misleading to an ordinary investor (*id.* at 189-90). Defendants' statements about the capabilities of Axsome's suppliers could not possibly have been sincerely held given their knowledge of the complete shutdown of the Company's AXS-07 manufacturer, as discussed in connection with scienter above. Moreover, regardless of what Defendants believed, their statements are independently actionable under *Omnicare*'s third prong, because they omitted that crucial fact that made their statements misleading to an ordinary investor. *See Shash v. Biogen*, 84 F.4th 1, 12-13 (1st Cir. 2023) (holding "couching a statement in terms of an opinion" does not preclude liability, reversing

---

[13] Defendants' cases, unlike here, dealt with risks that were specifically disclosed and did not involve risk disclosures that were themselves misleading. (Mem. at 18-19 (citing *In re Aratana*, 315 F. Supp. at 757, 759-60 (need for approval of third-party manufacturer was disclosed); *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at \*9 (S.D.N.Y. Jan. 2, 2013) (risk that resulted in failure to meet revenue forecast was "common knowledge")); *infra* at 22 n.16.

dismissal regarding omission that "would have contextualized" defendants' statement); *Odonate*, 2021 WL 3406271, at \*5 (opinion that "side effects were 'manageable'" was actionable because it omitted "emergency change in protocol" that was "implemented to manage side effects").

Defendants, ironically, call Plaintiffs' allegations "cherry-picked" by inaccurately accusing them of leaving out the word "belief" in reference to a particular misstatement. (Mem. at 24). This contention ignores the ***five separate times*** the Complaint references Defendants' purported belief in this statement. ¶¶ 96, 132, 138, 148, 153. Defendants cannot evade liability by omitting known facts and then seeking immunity by inserting the word "belief" into false statements.

Furthermore, Defendants made additional misstatements concerning the manufacturing of AXS-07 and the CMC component of its NDA that cannot possibly be described as forward-looking or opinion statements. These include statements reassuring investors about "the manufacturing process for AXS-07" in light of manufacturing problems that slowed FDA approval of AXS-05 (¶ 134) and then denying any concern over manufacturing issues with the AXS-07 (¶¶ 142-43). These statements were misleading because even as the inability to produce AXS-07 dragged on for months after its NDA was under review, Defendants continued to reassure investors that they did not have any reason to be concerned with CMC issues related to AXS-07.

Defendants argue that these statements were "accurate statements of fact," they did not have a duty to disclose the CMC issues with AXS-07, and their statements were not "so incomplete as to mislead." (Mem. at 20-23). None of these averments is convincing. Even a statement that is literally true when viewed in isolation, which the statements here were not, "can be misleading in context if it leaves investors with a false impression." *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at \*23 (S.D.N.Y. Sept. 20, 2019). It is a stretch to say that any of these statements were technically "truthful," but even if they were, they were actionably "incomplete" and "misleading"

20

because they left out crucial data that was needed for "a reasonable investor to make an accurate assessment" of Defendants' reassurances as to the manufacturing of AXS-07. *Delcath Sys.*, 36 F. Supp. 3d at 332; *Odonate*, 2021 WL 3406271, at *6 (holding a reasonable investor may consider the omission of negative trial information to be materially misleading).[14]

### 2.   Statements Concerning the AXS-07 NDA Were False and Misleading

Defendants also made misstatements that promoted AXS-07's prospects for FDA approval. ¶¶ 128, 140, 143, 146, 150. These statements were false and misleading because they described the AXS-07 NDA positively while concealing the manufacturing problems that prevented Axsome from being able to conduct the stability studies that would support its approval.

It is misleading for Defendants to portray the prospects for FDA approval within a certain timeframe in a positive light while omitting negative information that was likely to cause delays or lead to rejection of the NDA. *See Novavax*, 645 F. Supp. 3d at 520 (holding that by choosing to speak positively "about the timeline for regulatory approval and the manufacturing progress," omitting "contamination and purity issues" misrepresented the "ability to obtain regulatory approval and produce" at scale); *Acadia Pharms.*, 2016 WL 5076147, at *3, *5-6 (holding statement about NDA was misleading because "third-party contract manufacturers" could not support "commercial-scale operations" necessary for CMC section of the NDA); *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003) (statement that company "reasonably expected approval by the FDA in early 2002" was actionable where defendants knew "it was not

---

[14] Defendants' cases dealt with different situations. (Mem. at 21-23 (citing *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *13 (S.D.N.Y. Apr. 2, 2020) (issues in one business did not contradict broader plan for margin expansion or to improve the business); *Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992) (holding no freestanding duty to disclose all material information related to buyout); *Noble Asset Mgmt. v. Allos Theraps.*, 2005 WL 4161977, at *6 (D. Colo. Oct. 20, 2005) (addressing failure to disclose that positive results were exploratory); *Backman v. Polaroid Corp.*, 910 F.2d 10, 15-16 (1st Cir. 1990) (alleged misstatements were true)). Here, unlike in *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), there was no "data to interpret" in light of Axsome's established inability to manufacture AXS-07. *Intellipharmaceutics*, 348 F. Supp. 3d at 325 (distinguishing *Sanofi*); *Delcath*, 36 F. Supp. 3d at 333 (approving allegations of "data that was not disclosed" rather than "differing interpretations of disclosed data")).

reasonably foreseeable"); *Odonate*, 2021 WL 3406271, at *5 (positive statements gave a misleading "impression that [the Phase 3 study] was proceeding as expected, with no significant setbacks"); *Immunomedics*, 2020 WL 4381924, at *6 (positive statements about FDA review were actionable based on awareness of data breach that "could seriously jeopardize" approval). So too here, throughout the Class Period, Defendants continued to misleadingly promote the NDA as "supported by" the positive results from clinical trials, denied that manufacturing issues might delay FDA approval, and highlighted the upcoming "target action date for the AXS-07 NDA of April 30, 2022." ¶¶ 140, 143, 146, 150.[15] These statements gave investors a misleading impression of the level of risk associated with the AXS-07 NDA.

Defendants argue, as with their CMC statements, that their statements concerning the level of support for the AXS-07 NDA were forward-looking and protected by the safe harbor. (Mem. at 19-20). But statements describing the existing level of support for the NDA currently under review are statements of present or historical fact describing the current status of the NDA. *See Acadia Pharms.*, 2016 WL 5076147, at *6 (holding "'on track' assurances were representations about the current state of affairs" of "the NDA process"). Moreover, even if certain of these statements are forward looking, the safe harbor does not apply because the cautionary statements that Defendants cite (Mem. at 19-20) were themselves misleading as the risks they discussed already transpired. *See supra* at 18-19.[16] Other risk disclosures that Defendants provided were boilerplate statements about the nature of the "regulatory approval process" that did not disclose the specific risk at issue

---

[15] Defendants' statement on May 10, 2021 was false not based on the timeline for submission of the NDA (Mem. at 19), but because it described the submission as a "quality filing." ¶ 128.

[16] The cases that Defendants cite dealt with much more pertinent risk disclosures. (Mem. at 19-20 (citing *Lefkowitz v. Synacor*, 2019 WL 4053956, at *9 (S.D.N.Y. Aug. 28, 2019) (addressing knowledge prong of safe harbor); *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *7 (S.D.N.Y. Sept. 12, 2022) (holdings statements were not rendered misleading based on omissions of "granular" dosage information); *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 734 (S.D.N.Y. 2018) (not addressing safe harbor); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10-11 (S.D.N.Y. Sept. 14, 2015) (holding certain studies "support[ed] Defendants' positive interpretation of the data" and defendants disclosed negative data that was allegedly omitted); *see also supra* at 19 n.13).

here and are therefore not "sufficient cautionary language." *ImClone*, 2003 WL 21297285, at *1.

Defendants also mischaracterize their statements about the AXS-07 NDA as opinion statements. (Mem. at 21 n.36). Several of the statements that they reference did not contain opinion phrases, such as "I believe" or "I think." *Omnicare*, 575 U.S. at 187; ¶¶ 128, 140, 150. And even if any of their statements qualify as opinions, they are actionable under *Omnicare* for the independent reasons that (1) Defendants could not possibly have believed them and (2) they were contradicted by the manufacturing problems that Defendants omitted. (*See supra* at 19-20); *In re iDreamSky Tech. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (holding failure to disclose "then-known [product launch] delays" was misleading even "in the context of an opinion").

Lastly, Defendants' arguments that certain statements concerning the AXS-07 NDA were accurate or not "so incomplete as to mislead," and that they did not have a duty to disclose (Mem. at 20-23), fail for the reasons described above as to their CMC statements. (*See supra* at 20-21).

### 3.    Defendants' Statements Are Not Puffery

Statements are not puffery when they provide "a completely misleading description of" events. *Ark. Teach. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014). (*See* Mem. at 21-22). Defendants' statements about CMC issues and support for the AXS-07 NDA are actionable because they were material for investors to assess the level of risk associated with Axsome's ability to commercialize AXS-07 in light of the severe manufacturing problems that prevailed at the time. *See Novak*, 216 F.3d at 315 (statements that inventory was "'in good shape' or 'under control' . . . were plainly" actionable); *Odonate*, 2021 WL 3406271, at *5 (positive descriptions of drug's potential gave misimpression that it faced "no significant setbacks"); *Emergent BioSolutions*, 2023 WL 5671608, at *17, *28-29 (holding statements about

23

manufacturing capabilities not puffery).[17]

## C.    The Complaint Adequately Alleges Loss Causation

Defendants incorrectly assert that the Complaint fails adequately to plead loss causation. (Mem. at 24-25). Alleging loss causation requires only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Rule 8(a)'s notice pleading standard applies. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). To be a corrective disclosure, the statement must reveal that "the *subject* of the fraudulent statement" caused plaintiff's loss. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016); *E\*Trade*, 712 F. Supp. 2d at 202 (holding mirror disclosure not necessary).

The Complaint pleads that in response to Defendants' disclosure that the FDA was rejecting the AXS-07 NDA in its present form because of CMC issues, Axsome's stock price fell almost 22%. ¶¶ 161-64. The corrective disclosure tied the delay in FDA approval to "the need for additional CMC data pertaining to the drug product and manufacturing process" (¶ 58)—the very facts the Complaint alleges Defendants failed to disclose. At the pleading stage, no more specificity with respect to the manufacturing problems is required. *See Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at \*19 (S.D.N.Y. June 17, 2020) (denying dismissal, in part, finding that defendant's failing to reveal a material fact upon correction cannot defeat loss causation.); *Delcath Sys.*, 36 F. Supp. 3d at 336 (denying dismissal, finding that "[t]his is a factual argument for a later day"); *Cohen v. Kitov Pharms. Holds., Ltd.*, 2018 WL 1406619, at \*6-7 (S.D.N.Y. Mar. 20, 2018) (Schofield, J.) (rejecting challenge to loss causation).

---

[17] In the cases that Defendants cite, there were no omitted facts that rendered statements misleading. (*See* Mem. at 22 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014) (representation about "*adequate* diversification of risk" did not "constitute a guarantee that UBS would not accumulate a $100 billion RMBS portfolio"); *Adient*, 2020 WL 1644018, at \*22 ("Plaintiffs have not alleged specific contradictory facts[.]"); *In re GPC Biotech AG Sec. Litig.*, 2009 WL 5125130, at \*1-2, \*6-7 (S.D.N.Y. Dec. 29, 2009) (addressing statement "creating the impression that the trial was going well" after plaintiffs were forced to delete "critical allegations")).

24

Defendants argue that Plaintiffs have not sufficiently alleged "that the basis for the FDA's denial" was the "inability to manufacture AXS-07." (Mem. at 24). The Complaint, however, supports the inference that the NDA was denied because Axsome could not obtain stability data since it was unable to manufacture new batches of AXS-07. ¶¶ 109-10; *see supra* at 2-4, 6, 11-14. Next, Defendants assert that they disclosed the risk that materialized with the FDA's denial of the NDA. (Mem. at 24-25). But Defendants concealed then-existing CMC problems that materialized at the end of the Class Period with the FDA's rejection of the NDA. The Complaint thus adequately pleads loss causation both by corrective disclosure and materialization of a concealed risk. *See Vivendi*, 838 F.3d at 262 (loss causation satisfied when misstatements concealed risk that materialized); *Rosi v. Aclaris Theraps., Inc.*, 2021 WL 1177505, at *26 (S.D.N.Y. Mar. 29, 2021) (denying dismissal, in part, because omitted facts resulted in materialization of concealed risk).[18]

### D.      The Complaint Adequately Alleges Claims Under Section 20(a)

The Complaint adequately alleges a primary violation of Section 10(b) above, and that the Individual Defendants controlled Axsome. ¶¶ 19-24, 173-77, 210-15. Plaintiffs have thus adequately alleged a *prima facie* case under § 20(a). *See Kitov Pharms.*, 2018 WL 1406619, at *9 (denying motion to dismiss Section 20(a) claim based on rulings as to primary claim and control).[19]

### IV.     CONCLUSION

For all of these reasons, the Court should deny Defendants' Motion in its entirety. In the alternative, Plaintiffs respectfully request leave to amend, which the Court should grant because it has not yet had occasion to rule on the core of Plaintiffs' claims. *See Loreley*, 797 F.3d at 190.

---

[18] In *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (Mem. at 24), in contrast, the alleged corrective disclosure was merely a journalistic characterization of already-public information.

[19] While Section 20(a) does not require pleading particularized facts showing conscious misbehavior or recklessness at this stage, Plaintiffs have done so as to Defendants Tabuteau, Jacobson, and Laliberte, as explained above. *See supra* at 7-15; *see also* Plaintiffs' accompanying response to Defendants Pizzie and O'Gorman's Motion to Dismiss.

Dated:  April 11, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld*_____
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Jacob Goldberg
Erica Stone
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
jgoldberg@rosenlegal.com
estone@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs
Thomas Giblin, Paul Berger, and Paul
Sutherland*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff
Thomas Giblin*

**PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz (LP-7324)
97-45 Queens Boulevard
Suite 1202
Rego Park, New York 11374

26

Telephone: (212) 685-0969
lpaskowitz@pasklaw.com

*Additional Counsel for Lead Plaintiff Paul
Berger, for himself and as sole trustee of the
Paul Berger Revocable Trust*