# Exhibit 1

**Establishment Inspection Report**

Axsome Therapeutics, Inc.

New York, NY 10007-3139

| | | |
|---|---|---|
| FEI: | **3018815311** |
| EI Start: | 6/21/2021 |
| EI End: | 7/1/2021 |

TABLE OF CONTENTS

Summary ........................................................................................................... 1

Administrative Data ........................................................................................... 3

History ................................................................................................................ 3

Interstate (I.S.) Commerce and Jurisdiction ..................................................... 4

Individual Responsibility and Persons Interviewed .......................................... 4

Organization and Personnel ............................................................................... 6

Registration of Studies on Clinicaltrial.gov ...................................................... 8

Selection and Monitoring of Clinical Investigators .......................................... 8

Selection of Monitors ......................................................................................... 9

Monitoring Procedures and Activities ............................................................. 10

Quality Assurance ............................................................................................ 11

Safety Adverse Events Reporting .................................................................... 11

Data Collection and Handling .......................................................................... 12

Record Retention ............................................................................................. 16

Financial Disclosure ........................................................................................ 16

Electronic Records And Electronic Signatures ................................................ 16

Test Article ...................................................................................................... 17

Objectionable Conditions and Management's Response .................................. 18

Refusals ............................................................................................................ 18

General Discussion with Management .............................................................. 18

Additional Information ..................................................................................... 20

Samples Collected ............................................................................................ 20

Voluntary Corrections ...................................................................................... 20

Exhibits Collected ............................................................................................ 21

Attachments ..................................................................................................... 21

**SUMMARY**

This mission critical, PDUFA, Pre-market, original surveillance inspection of a clinical trial sponsor, Axsome Therapeutics Inc. was conducted at the request of the office of Scientific Investigations/CDER. It was conducted in accordance with compliance program 7348.810, Sponsors, Contract Research Organizations and Monitors, and the assignment memorandum dated 5/4/2021 (**Attachment # 2**). The inspection is part of the BIMO FY 21 workplan. The inspection was covered under eNSpect OPID # 200298 and FACTS # 12117778.

The assignment requested the inspection of Axsome Therapeutics Inc. and its conduct of two study protocols submitted under (b) (4)         ). This is the first FDA inspection for Axsome Therapeutics Inc. The protocols covered include:

**Establishment Inspection Report**

Axsome Therapeutics, Inc.

New York, NY 10007-3139

| | |
|---|---|
| FEI: | **3018815311** |
| EI Start: | 6/21/2021 |
| EI End: | 7/1/2021 |



Records reviewed during this comprehensive inspection include but are not limited to organizational charts, study protocols, financial disclosures, form FDA 1572s, contracts/transfer of regulatory authority, standard operating procedures, monitoring reports, investigator CVs, investigator and monitor selection records, training records, IND annual reports, data collection and management records, case report forms, operational manuals, and test article accountability records.

A form FDA 483 "Inspectional Observation" was not issued at the conclusion of the current inspection. The following discussion items were presented and discussed with management during the close out meeting.

- Results and a copy of protocol # (b) (4) are not yet posted in clincaltrial.gov.

- Source records for protocol # (b) (4) were transcribed into paper Case Report Forms (CRFs) by site personnel. 100% of CRFs are not signed/initial and dated by the transcriber.

- Case report forms for three subjects enrolled in protocol # (b) (4) have data changes that were entered after the principal investigator signed and dated the CRFs.

- Two study monitors recruited and assigned monitoring duties for protocol # (b) (4) did not meet all requirements set forth in the sponsor's job descriptions for study monitors.

- The (b) (4) EDC data base system used to capture and maintain protocol # (b) (4) eCRFs does not have the capability to capture and maintain all eCRF audit trail history. For example, eCRFs audit history lacks information on the database lock date and by whom.

Each of the discussion items was discussed with management during the close-out meeting. Mr. Herriot (NMI) Tabuteau, Chief Executive Officer stated that the firm will not provide a written response to the FDA. Each discussion item is covered in detail in the **General Discussion with Management** section of this report.

There were no refusals and no samples were collected.

**Establishment Inspection Report**

Axsome Therapeutics, Inc.

New York, NY 10007-3139

| | |
|---|---|
| FEI: | **3018815311** |
| EI Start: | 6/21/2021 |
| EI End: | 7/1/2021 |

FACTS data and eNSpect data for the firm was reviewed and updated to reflect the firm's main line telephone number, fax number and e-mail address for the main point of contact.

**ADMINISTRATIVE DATA**

Inspected firm:        Axsome Therapeutics, Inc.
Location:              22 Cortlandt St Fl 16
                       New York, NY 10007-3139
Phone:                 1-9212-332-3241
FAX:                   1-212-320-0245
Mailing address:       22 Cortlandt St Fl 16
                       New York, NY 10007-3139
Email address:         (b) (6)
Dates of inspection:   6/21/2021-6/25/2021, 6/28/2021-7/1/2021
Days in the facility:  9
Participants:          **Geoffrey K Kilili, Investigator**

Non-FDA Participants: None

FMD-145 and post inspectional correspondence should be addressed to:
Herriot (NMI) Tabuteau, MD: Chief Executive Officer
Axsome Therapeutics Inc.,
 22 Cortlandt St, 16th Floor,
New York, NY 10007
Phone: 212-203-5072
e-mail (b) (6)

This inspection was pre-announced. On 6/21/2021, I presented my credentials and issued a form FDA 482, "Notice of Inspection" to Herriot (NMI) Tabuteau, Chief Executive Officer, Axsome Therapeutics Inc. Dr. Tabuteau identified himself as the most responsible person. I explained the purpose of the inspection, and requested the documents needed to conduct the inspection. In addition to Dr. Tabuteau, the following individuals were present at the opening meeting:
- Shelly G. Ogiste: Senior director, quality.
- Caroline P. Streicher: Senior director, clinical operations.
- Amanda E. Jones: Senior vice president clinical development.
- Mark L. Jacobson: Chief operating officer.
- Cheryl A. Askew: Director, clinical operations.
- Kevin J. Laliberte: Executive vice president, product development.

**HISTORY**

Axsome Therapeutics Inc. is a biopharmaceutical company involved in the discovery and development of novel therapies for Central Nervous System (CNS) disorders. The company was founded in 2012 by Dr. Herriot (NMI) Tabuteau. Dr. Tabuteau is also the most responsible person and Chief Executive Officer (CEO). His office is located at 22 Cortlandt St Fl 16, New York, NY 10007. He explained the company does not currently have any subsidiaries.

**Establishment Inspection Report**                      FEI:              **3018815311**
Axsome Therapeutics, Inc.                               EI Start:          6/21/2021
New York, NY 10007-3139                                 EI End:            7/1/2021

___

During the opening meeting Ms. Amanda E. Jones Senior VP, clinical development, and Ms. Shelly G. Ogiste, Senior director, quality gave a presentation covering the history of Axsome Therapeutics Inc. its organizational structure and the clinical developmental of (b) (4) **(Exhibit GKK # 1).**

AXS-05 was granted FDA breakthrough therapy designation for the treatment of Major Depressive Disorder (MDD) disorder in 2019.

Currently, Axsome's pipeline of drug candidates include, AXS-05, indicated for major depressive disorder, alzheimer's disease agitation, and smoking sensation. AXS-07 for migraine. AXS-12 for narcolepsy, and AXS-14 for fibromyalgia.

Dr. Tabuteau explained that Axsome Therapeutics Inc. became a publicly traded company in 2015 and has approximately (b) (4) full time employees. This is the (b) (4) NDA submission for Axsome Therapeutics Inc.

The establishment's hours of operation are Monday to Friday (b) (4)

**INTERSTATE (I.S.) COMMERCE AND JURISDICTION**
Axsome Therapeutics Inc. is a sponsor of human based clinical research studies nationally. Shipping records show that the investigational product used during the conduct of protocol # (b) (4) (b) (4)                         was shipped from (b) (4)                   (currently known as (b) (4)          ) located at (b) (4)                                           to a (b) (4)                           located at (b) (4)                                    .

Shipping records show that the investigational product was shipped interstate from (b) (4) (b) (4)                   to clinical study sites located in various states in the US.

**INDIVIDUAL RESPONSIBILITY AND PERSONS INTERVIEWED**
**Herriot (NMI) Tabuteau MD, Chief Executive Officer:** Dr. Tabuteau is the founder, Chief Executive officer and most responsible person in Axsome Therapeutics Inc. He stated that as the founder of Axsome Therapeutics Inc., he is and has been involve in almost every aspect associated with the development, implementation, and realization of (b) (4) drug development projects. These include but not limited to:
- Correspondence and interaction with FDA regulatory officials.
- Initial and continuing product development and regulatory strategies.
- Clinical development and clinical trial outlook and implementation.
- Protocol development and review.
- Budget and finance.
- IND and NDA fillings.
- Oversight all company departments and personnel.

Mr. Tabuteau was present and available throughout the duration of the inspection. He reports to the board of directors.

**Establishment Inspection Report**        FEI:     **3018815311**

Axsome Therapeutics, Inc.                EI Start:     6/21/2021

New York, NY 10007-3139              EI End:      7/1/2021

---

**Ms. Amanda E. Jones, Senior VP, clinical development:** Ms. Jones joined Axsome Therapeutics Inc. around June 2015 and assumed the position of VP, clinical development in 2020. She stated that her responsibilities include overseeing protocol development, statistical data analysis, writing and review of clinical study reports, and third party vendor qualification and management.

Ms. Jones was one of the key points of conduct during the inspection and provided me with the records I needed to complete the inspection and provided answers/clarification to my questions. She reports to Dr. Herriot (NMI) Tabuteau, Chief Executive Officer.

**Shelly G. Ogiste, Senior Director, quality:** Ms. Ogiste joined Axsome Therapeutics Inc. in January 2020. She is the first employee of the quality assurance unit at the Axsome Therapeutics Inc. and tasked with the responsibilities of overseeing the establishment of an internal quality assurance unit. She stated that her other responsibilities include overseeing GMP and GCP quality assurance training, qualification of third party vendors, site audits, SOP development and management systems, and oversight on site monitoring policies and practices.

Ms. Ogiste was another key point of contact during the inspection. She accompanied me every day of the inspection, provided answers/clarification to my inquiries and managed my day to day requests during the inspection. She reports to Kevin J. Laliberte, Executive VP, Product strategy.

**Caroline P. Streicher, Senior Director Clinical Operations:** Ms. Streicher joined Axsome Therapeutics Inc. in 2019. She stated that her responsibilities include development and review of study documents including the protocol, study monitoring plans and safety monitoring plans. She also oversees the selection of site/principal investigators and management of the clinical trial team. Ms. Streicher, accompanied me every day of the inspection, provided answers/clarification to my inquiries and managed my day to day requests during the inspection.

**Cheryl A. Askew, Director Clinical Operations:** Ms. Askew joined Axsome Therapeutics Inc. in September 2018. She stated that her responsibilities include management of study monitoring activities, selection and workload management for field clinical research associates, and if necessary, participate in escalation/resolution of site action items. Ms. Askew served the role of scribe during the inspection. She reports to Ms. Amanda E. Jones senior VP, clinical development.

**Cedric J. O'Gorman, MD, Senior VP Medial affairs:** Dr. O'Gorman joined Axsome Therapeutics Inc. in September 2017. He stated that his responsibilities include overseeing and providing medical monitoring services, safety meetings, and evaluation of adverse events and adverse event reports. Mr. O'Gorman provided me with information and clarifications appertaining to the procedures used in the capture and reporting of adverse events during the conduct of both protocol # (b) (4) (b) (4)   (b) (4)   He reports to Dr. Herriot (NMI) Tabuteau, Chief Executive Officer.

**Kevin J. Laliberte, Executive VP Product strategy:** Mr. Laliberte joined Axsome Therapeutics Inc. in January 2021. He stated that he previously worked (b) (6) (b) (6)   . He stated that his responsibilities include overseeing multiple departments

**Establishment Inspection Report**                          FEI:          **3018815311**

Axsome Therapeutics, Inc.                                    EI Start:         6/21/2021

New York, NY 10007-3139                                      EI End:           7/1/2021

---

including regulatory, chemistry manufacturing and controls, pharmacovigilance, supply chain, medical affairs, and research and operations. He reports to Dr. Herriot (NMI) Tabuteau, CEO.

**(b) (6)   (b) (6)   Senior clinical trial manager:** Ms. (b) (6)  stated that she acted as a clinical trial manager and clinical site monitor during the conduct of both protocol # (b) (4) (b) (4)(b) (4)          Ms. (b) (6)  provided me with details and clarifications appertaining to the site monitoring activities during the conduct of protocol # (b) (4)               (b) (4)                  She reports to Ms. Amanda E. Jones, senior VP, clinical development.

**ORGANIZATION AND PERSONNEL**
During the opening meeting, Ms. Jones and Ms. Ogiste provided a presentation focused on the branches and individuals involved in the development and conduct of protocol # (b) (4) and # (b) (4)          (Exhibit GKK # 1). Dr. Herriot (NMI) Tabuteau is the CEO of Axsome Therapeutics Inc. and the most responsible person. He has oversight over the following five key product development departments:

- Quality assurance/product strategy, headed by executive VP, Kevin J. Laliberte.
- Operations, headed by the chief operational officer, Mark L. Jacobson.
- Clinical development, headed by senior VP, Ms. Amanda E. Jones.
- Finance, headed by the chief financial officer Nick X. Pizzle.
- Commercial, headed by Lori A. Englebert, Executive VP, commerce, and business development.

Ms. Jones stated that she has the authority to review and approve study reports and data listings for both protocol # (b) (4)

Ms. Jones explained that Cedric J. O'Gorman, Senior VP medial affairs is the chief medical monitor and was responsible for making final evaluations and decisions in the review of adverse events and safety information for both protocol # (b) (4)               (b) (4)

For both protocol # (b) (4)               (b) (4)               clinical supplies including management and oversight of third party contractors was overseen by Chemistry, Manufacturing and Control (CMC) team. Ms. Jones stated that key individuals included Karen L. TenHuisen, VP CMC, and (b) (6)  (b) (6)  associate manager, research, and operations. Both Ms. TenHuisen and Mr. (b) (6)  reports to Kevin J. Laliberte, executive VP product strategy.

**_Protocol #(_(b) (4)          Ms. Jones stated that the initial protocol draft was developed by Kellie A. Kennon, director clinical operations and (b) (6)   (b) (6)   trial manager. The final draft was signed and approved by Cedric J. O'Gorman, medical monitor and senior VP medical affairs, Robert Niecestro VP clinical and regulatory affairs and Kellie A. Kennon.

Ms. Jones stated that implementation of the study clinical trial events including investigator qualification/selection, selection of study monitors, monitoring activities and review of monitoring reports were overseen by Ms. Kennon, and Ms. (b) (6)   Both Ms. Kennon and Ms. (b) (6)  reports to Ms. Amanda E. Jones Senior VP, clinical development.

**Establishment Inspection Report**                    FEI:          **3018815311**
Axsome Therapeutics, Inc.                              EI Start:     6/21/2021
New York, NY 10007-3139                                EI End:       7/1/2021

I obtained copies of agreements documenting the responsibilities transferred to third party contractors. I observed some contractors were reported on form 1571 that was submitted to the FDA. These include, (b) (4)                                                              .

| CRO name | Address | Responsibilities transferred | Exhibit |
|---|---|---|---|
| | | | GKK # 2 |
| | | | GKK # 3 |
| | | | GKK # 4 |
| | | | GKK # 5 |
| | | | GKK # 6 |
| | | | GKK # 7 |



***Protocol #*** (b) (4)          Ms. Caroline P. Streicher, senior director clinical operations stated that protocol development was done by Amanda Jones, senior VP, clinical development, and Cedric J. O'Gorman, senior VP medial affairs. Ms. Streicher and (b) (6)    (b) (6) senior clinical trial manager provided feedback. The final protocol was approved by Ms. Jones and Mr. O'Gorman.

Ms. Streicher explained that she was the key individual involved in study site administration including qualification and selection of clinical investigators. Cheryl A. Askew, director clinical operation and (b) (6)    (b) (6) senior clinical trial manager completed monitor selection and implementation of monitoring activities. They report to Ms. Jones, senior VP, clinical development.

I obtained a list of third party contractors **(Exhibit GKK # 8).** I observed that form FDA 1571 for protocol # (b) (4)          did not list any of the third party contractors. Vendors with signed work transfer agreements include the following:

| CRO name | Address | Responsibilities transferred | Exhibit |
|---|---|---|---|
| | | | GKK # 4 |
| | | | GKK # 9 |
| | | | GKK # 10 |
| | | | GKK # 11 |
| | | | GKK # 12 |
| | | | GKK # 13 |
| | | | GKK # 14 |
| | | | GKK # 15 |



**Establishment Inspection Report**                          FEI:          **3018815311**
Axsome Therapeutics, Inc.                                    EI Start:        6/21/2021
New York, NY 10007-3139                                      EI End:          7/1/2021

---

## REGISTRATION OF STUDIES ON CLINICALTRIAL.GOV

*Protocol #* (b) (4)            Initial registration of the study on clinicaltrials.gov occurred on (b) (4)    under clinicaltrials.gov identifier # (b) (4)       . The first subject was enrolled on (b) (4)  . The date of the last visit for the final study subject (visit 9) occurred on 12/27/2018.

My review of the current status of protocol # (b) (4)         in clincaltrial.gov indicated that a summary of study results and a copy of the protocol have not yet been posted in clincaltrial.gov per regulatory requirements. Please see the **"General Discussion with Management"** section of this report for details.

*Protocol #* (b) (4)           Initial registration of the study on clinicaltrials.gov occurred on (b) (4)    under clinicaltrials.gov identifier # (b) (4)        . The first subject was enrolled on (b) (4)  . The primary completion date of the study is (b) (4)   .

My review of the current status of protocol # (b) (4)        in clincaltrial.gov indicated that a summary of study results and a copy of the study protocol have not been posted in clincaltrial.gov per regulatory requirements.

Ms. Jones explained that the sponsor received FDA approval to delay the posting for one year until 2022 **(Exhibit GKK # 16).**

For both protocol # (b) (4)        and protocol # (b) (4)         I reviewed and determined that the sponsor completed and submitted form FDA 3674 to the FDA. I also reviewed master informed consent documents that the sponsor distributed to clinical sites and determined that the required statement referencing clinicaltrial.gov was included.

## SELECTION AND MONITORING OF CLINICAL INVESTIGATORS

All study site participating in the conduct of protocol # (b) (4)        and protocol # (b) (4)       were located in the US.

For protocol # (b) (4)        four sites were activated and enrolled subjects. I reviewed records for all four sites. I confirmed that all four investigators had a signed form FDA 1572.

Forty three sites were activated for protocol # (b) (4)        Three sites including 841, 820 and 825 did not enroll any subjects. Ms. Jones stated that all 43 clinical investigators signed form FDA 1572 before participation in the clinical study. I selected twelve sites with high subject enrollment for review including the sites identified in the assignment memo. These sites include 806, 807, 808, 811, 812, 814, 817, 823, 828, 830, 833, and 834. I confirmed that all twelve investigators had a signed form FDA 1572.

*The following paragraphs contain information covering both protocol #* (b) (4)        *and #* (b) (4)        *unless otherwise indicated.*

**Establishment Inspection Report**                                FEI:        **3018815311**
Axsome Therapeutics, Inc.                                         EI Start:       6/21/2021
New York, NY 10007-3139                                           EI End:          7/1/2021

I reviewed the sponsor's SOPs for site evaluation and investigator selection and found no concerns. Ms. Jones and Ms. Streicher explained that key considerations for the selection of investigators included the completion of a feasibility questionnaire, a current CV, valid medical license, experience in (b) (4)                        , previous experience working with the investigator as well as regulatory and debarment actions. I reviewed these records and found that the sponsor followed the SOP requirements and the clinical investigators were qualified by education and experience.

I reviewed site selection and activations letters documenting that the sponsor provided investigators with a start-up package containing necessary information such as the protocol, investigator brochure, and regulatory document completion guidelines prior to initiation of the clinical trial. I also reviewed site initiation reports and PowerPoint slides that the sponsor used to conduct site initiation training for participating sites. My review of these records did not reveal any concerns.

I observed that the sponsor criteria for dealing with non-compliant investigators was included in the clinical monitoring plans for both protocol # (b) (4)          and # (b) (4)          Ms. Jones and Ms. Streicher explained that, generally, non-compliant incidences and applicable corrective action plans are discussed with the affected investigator during site monitoring visits. They added that, if the site fails to resolve the matter in a timely manner, the issue can be escalated to the study lead and upper management.

My review of site monitoring reports and statements from Ms. Jones and Ms. Streicher indicated that all investigators remained compliant during the conduct of protocol # (b) (4)          and # (b) (4)          No incidences of escalation to management occurred and no sites were terminated.

**SELECTION OF MONITORS**
I obtained a list of all Clinical Research Associates (CRA) that were assigned study monitoring duties during the conduct of protocol # (b) (4)          and # (b) (4)          I also obtained a copy of their CVs and job descriptions.

Per the job descriptions **(Exhibit GKK # 17),** CRA qualifications required BA/BS or equivalent degree in a scientific field and a minimum of three years of clinical trial experience.

My review of monitoring reports and CVs showed that CRAs (b) (6)          participated in the monitoring of protocol # (b) (4)          but did not meet the experience and /or the education requirements. Please see the **"General Discussion with Management"** section of this report for details.

Ms. Jones explained that CRAs ensured that study sites remained compliant to the protocol and applicable regulations. Medical monitors and medical monitoring involved medical/scientific consultation and providing guidance/support to the study sites regarding, but not limited to, patient eligibility, safety questions, and study-specific safety training. Please see the "**Safety/ Adverse Event Reporting"** section of this report for more details on safety monitoring and reporting.

**Establishment Inspection Report**                                  FEI:         **3018815311**
Axsome Therapeutics, Inc.                                            EI Start:      6/21/2021
New York, NY 10007-3139                                             EI End:        7/1/2021

---

## MONITORING PROCEDURES AND ACTIVITIES

*Protocol #* (b) (4)          Sponsor monitoring procedures are documented in the clinical monitoring plan **(Exhibit GKK # 18)**. I reviewed monitoring reports for all four sites that participated in the conduct of protocol # (b) (4)          I observed that the monitoring reports were reviewed and signed by either Kellie Kennon, director clinical operations or (b) (6) (b) (6) associate clinical trial manager.

*Protocol #* (b) (4)          The sponsor monitoring procedures used during the conduct of protocol # (b) (4)          are documented in the clinical monitoring plan **(Exhibit GKK # 19)**. I reviewed monitoring reports for the twelve sites identified above that participated in the conduct of protocol # (b) (4)          I observed that monitoring reports were reviewed and signed by either (b) (6)       (b) (6) senior clinical trial manager or Caroline P. Streicher: senior director, clinical operations.

*The following paragraphs contain information covering both protocol #* (b) (4)          *and #* (b) (4)          *unless otherwise indicated.*

For both protocol # (b) (4)          and # (b) (4)          I reviewed site evaluation reports, initiation visit reports and interim monitoring visit reports and found them to reflect that investigators were compliant to required regulations, and SOPs. I found that the sponsor's monitoring activities were adequate and in line with the procedures described in the study monitoring plans and applicable SOPs. I did not observe any concerns.

I observed that each monitoring report included sections covering the evaluation and documentation of the adequacy of the investigator oversight, whether the investigator and site staff maintained compliance to the protocol and applicable regulations including IRB approvals. Other areas covered include, obtaining of informed consent, IP accountability and reconciliations, as well as adequacy of the site facilities and equipment. Monitoring reports also have sections documenting if study sites properly documented and reported adverse events and any incidents of protocol deviation.

I observed that monitoring reports also captured and tracked any observed discrepancies, queries or action items and the implementation of any agreed upon corrective actions. Based on the time frames documented in monitoring reports, it appeared that all sites moved to resolve any existing action items and queries in a timely manner. I did not observe any concerns.

Based on the study monitoring plans and statements from Ms. Jones and Ms. Streicher, Source Document Verification (SDV) against corresponding CRFs occurred for 100 % of source documents with the exception of subject diaries ((b) (4)          ). Random sampling was used for the verification of (b) (4).

Ms. (b) (6)  explained that CRAs are required to document subject IDs and the nature of source records verified at each monitoring visit. She added that the firm did not use any data verification forms. My review of monitoring visit reports confirmed that this was the case.

**Establishment Inspection Report**                    FEI:           **3018815311**
Axsome Therapeutics, Inc.                               EI Start:          6/21/2021
New York, NY 10007-3139                                 EI End:             7/1/2021

---

Ms. (b) (6) stated that only delegated study site personnel have the authority to make corrections to CRFs. Any discrepancies observed during monitoring were resolved onsite or a query was presentation to the affected sites to review and update/correct as necessary.

**QUALITY ASSURANCE**
Ms. Jones and Ms. Ogiste, senior director, quality, explained that Axsome Therapeutics Inc. did not have a dedicated quality assurance unit during the conduct of protocol # (b) (4) or protocol # (b) (4) She stated that the firm relied on standard operating procedures and independent contractors to oversee the implementation of necessary QA functions and audits. For example, **Exhibit GKK #1, Page 22.**

Ms. Ogiste explained that QA auditors maintain oversight over the quality of many of the processes involved in the conduct of a clinical trial including Good Manufacturing Procedures, Good Clinical Procedures and the quality of site monitoring processes and procedures.

She stated that two sites, 807 and 814 both participating in the conduct of protocol # (b) (4) were audited and reported in the Clinical Study Report submitted to the FDA. None of the site participating in the conduct of protocol # (b) (4) were audited.

**SAFETY ADVERSE EVENTS REPORTING**
The procedures used by the sponsor to govern receiving, processing, evaluation and monitoring of safety information/unanticipated adverse events are detailed in the following documents:
- Protocol # (b) (4) safety management plan (**Exhibit GKK # 21**).
- Protocol # (b) (4) safety management plan (**Exhibit GKK # 22**).

Cedric J. O'Gorman, MD, senior VP medial affairs was responsible for the final evaluations and decisions in the review of adverse events and safety information during the conduct of both protocol # (b) (4) and # (b) (4) He stated that Axsome Therapeutics Inc. contracted (b) (4) to provide pharmacovigilance (PV) services for both protocols.

My review of the safety management plan and statements from Dr. O'Gorman showed that study sites were required to report all SAEs to (b) (4) regardless of causality and expectedness. (b) (4) was responsible for the initial review, triage, SAE database entry, Medwatch safety report preparation and submission to the sponsor.

Axsome responsibilities included review of the SAE reports for medical accuracy and either concur or request modifications of the reported causality, expectedness, and regulatory reportability. Axsome was also responsible for the reporting of qualified SAEs to the FDA, the IRB, and clinical investigators.

Dr. O'Gorman stated that he engaged with investigators when necessary to provided medical opinion and answer any questions appertaining to (b) (4) drug interactions, drug safety and concomitant medications. He added that investigators were trained and advised to capture and report to the sponsor all adverse events that are observed or reported by the patient during study visits.

**Establishment Inspection Report**                                   FEI:          **3018815311**

Axsome Therapeutics, Inc.                                             EI Start:      6/21/2021

New York, NY 10007-3139                                               EI End:        7/1/2021

---

He explained that safety meetings were held each quarter to review safety data and analyze the rate, frequency, and severity of adverse events for potential trends and concerns. I reviewed a copy of the formal safety meeting report and found no concerns.

Dr. O'Gorman stated that for both protocol # (b) (4)          and # (b) (4)          there were no SAEs or adverse events that met the regulatory reporting criteria for SUSARS or Adverse Events of Special Interest (AESI). There were no IND safety reports that required submission to clinical investigators or the FDA.

My review of SAE reports showed there was one SAE report associated with protocol # (b) (4) One subject claimed to have experienced an episode of psychosis that led to overnight hospitalization. Since the hospitalization was for less than 24 hours, the sponsor requested the SAE to be downgraded to an AE. Information associated with the SAE report and its down grade is included as **Exhibit GKK # 23.**

One SAE of pancreatitis was reported for protocol # (b) (4)          The investigator documentation indicated that the SAE was not related to the study drug. Dr. O'Gorman and Ms. Streicher stated that the SAE did not meet the regulatory reporting criteria for SUSAR or AESI.

For the four sites (protocol # (b) (4)          and twelve sites (protocol # (b) (4) selected for review, I performed a random comparison of the nature, relationship, severity, intensity, and/or expectedness of adverse events reported in subject case report forms to those reported in the assignment data listings and found no discrepancies.

I did not find any evidence to suggest any under documentation or reporting of AEs. Dr. O'Gorman and Ms. Jones stated that all known AEs associated with (b) (4) (b) (4)          in plasma in both animals and human was included in the investigational brochure provided to clinical investigators (**Exhibit GKK # 20**).

**DATA COLLECTION AND HANDLING**

Ms. Jones provided a copy listing all clinical studies included in the clinical study report for NDA (b) (4)(**Exhibit GKK # 24**). I observed that both protocol # (b) (4)          and protocol # (b) (4)          were included in the list.

Ms. Jones stated that a data safety monitoring board was not constituted for either protocol # (b) (4)          or protocol # (b) (4)          She explained that it is the sponsors' position that (b) (4)          are already marketed as individual agents and their safety profiles are well known and documented.

*Protocol #* (b) (4)          *data collection and handling*
I obtained a copy of the clinical study report the sponsor submitted with the NDA application. I verified that clinical investigators for all four sites that signed form FDA 1572 to participate in the conduct of protocol # (b) (4)          were included. I did not observe any discrepancies.

**Establishment Inspection Report**                                          FEI:             **3018815311**

Axsome Therapeutics, Inc.                                                    EI Start:          6/21/2021

New York, NY 10007-3139                                                      EI End:             7/1/2021

___

I obtained a list documenting all participating study sites and the number of subjects enrolled at each site. I confirmed that the total number of randomized subjects matched the number indicated in the assignment memo and data listings. I verified that subject disposition and randomization data documented in the assignment data listings matched with data documented in the enrollment logs and CRFs submitted to the sponsor for the four sites. I did not observe any discrepancies.

I obtained and reviewed a copy of the sponsor clinical data management plan identifying individual stakeholders, their responsibilities, and the data management procedures followed during the conduct of Protocol # (b) (4)            **(Exhibit GKK # 25).**

Ms. (b) (6)              explained source data was transcribed into paper Case Report Forms (CRFs) by site personnel. I observed that 100% of the transcribed CRFs were not signed or initialed and dated by the individuals completing the transactions. Please see the **"General Discussion with Management"** section of this report for details.

CRFs were verified against source documents by study monitors during site monitoring visits. Each completed CRF casebook was signed by the principal investigator to acknowledge that the CRFs are complete and accurate.

During my review of completed and signed CRFs, I observed that CRFs for three subjects had data changes that were entered after the date of the principal investigator's confirmatory signature. Please see the **"General Discussion with Management"** section of this report for details.

I verified that subject disposition, adverse events, primary endpoint efficacy data, and concomitant medication data documented in the paper case reports forms matched with corresponding data provided in the assignment data listings for sites (b) (7)(E). I did not observe any discrepancies.

Paper CRFs were collected from study sites by study monitors and mailed to the sponsor address accompanied by a signed CRF transmittal log. A designated Axsome Therapeutics Inc. official signed each CRF transmittal log to confirm receipt. I performed a random review of CRF transmittal forms and found no concerns.

Ms. Jones stated that (b) (4)        ., **(Exhibit GKK # 5)** was contracted to design, a secure database equipped with audit trail capabilities. I reviewed user acceptance testing, and validation reports indicating that the software met the required release specifications before implementation.

Ms. Jones explained that two copies of the database were set up to enable double data entry and automated verification. Data captured in paper CRFs was transcribed into the Ofni electronic database by designated sponsor personnel. A data comparison software (b) (4)   " was used to compare data entries between the two databases to identify inconsistences and generate queries. Data Clarification Forms (DCF) were submitted to the affected study sites for clarifications. The principal investigator signed each DCF and returned to the sponsor. I reviewed randomly selected DCFs and found no concerns.

**Establishment Inspection Report**        FEI:      **3018815311**

Axsome Therapeutics, Inc.        EI Start:      6/21/2021

New York, NY 10007-3139        EI End:      7/1/2021

---

Once all queries were resolved and the data deemed accurate, the data base was locked on 12/28/2018 and study unblinding procedures were implemented.

*Protocol #* (b) (4)      *Randomization and Blinding Procedures*
Ms. Jones stated that Axsome Therapeutics Inc. contracted (b) (4) ., **(Exhibit GKK # 6)** and (b) (4) **(Exhibit GKK # 4)** to provide randomization and blinding services per protocol specifications. She explained that randomization schedule was generated by an independent unblinded statistician at (b) (4) . and provided to an unblinded clinical supply manager at (b) (4) .

Per Ms. (b) (6) statement and my review of the work agreement, blinding of the Investigational Product (IP) at (b) (4) occurred as follows:
- (b) (4) prepared treatment (b) (4) (b) (4) packaged into temper-evident sealed carton.
- Each (b) (4) was identified with the same unique med #.
- Med #s were merged with the randomized schedule to create a randomized kit list.
- Clinical investigator sites were provided with a randomization number list linked to a kit med #.
- Randomization numbers were assigned sequentially at the randomization visit.
- Subjects were dispensed the IP bottle identified with the med # number linked to their randomization number.

Jones stated that there were no accidental or planned unblinding incidences throughout the conduct of the study.

I reviewed records documenting sign off by the responsible parties conforming that all prerequisites for study unblinding including data base lock occurred on 12/28/2018.

I performed an unblinded review of the IP med #s dispensed to subjects at the two sites identified in the assignment memo, (b) (7)(E) ) and performed a random comparison with the subject treatment assignment allocations indicated in the assignment data listings and found no discrepancies.

*Protocol #* (b) (4)      *data collection and handling*
I obtained a copy of the clinical study report the sponsor submitted to the FDA. I verified that all forty three investigators who signed form FDA 1572 were listed in the clinical study report included with the NDA marketing application. I did not observe any discrepancies.

I obtained a list documenting all participating study sites and the number of subjects enrolled at each site. I confirmed that the total number of randomized subjects for all sites matched the number indicated in the assignment memo. For the twelve sites selected for review, I confirmed that the number of randomized subjects indicated for each site matched with the number documented in the site enrollment logs.

For the three sites identified in the assignment memo (b) (7)(E) ), I verified that subject disposition and randomization data documented in the assignment data listings matched with the

**Establishment Inspection Report**                    FEI:              **3018815311**
Axsome Therapeutics, Inc.                              EI Start:          6/21/2021
New York, NY 10007-3139                                EI End:            7/1/2021

---

data documented in the enrollment logs and CRFs submitted to the sponsor. I did not observe any discrepancies.

Case report forms for this study were maintained in electronic format using (b) (4) (b) (4)    Electronic Data Capture (EDC) system. I reviewed user acceptance and validation records documenting that the system was tested and passed validation for its intended use prior to the database "(b) (4)" date.

(b) (4)        . **(Exhibit GKK # 13)**, through its affiliate (b) (4)  was contracted to perform data management services after data base "(b) (4)" per the applicable data management plans and/or SOPs. I obtained and reviewed a copy of the sponsor clinical data management plan describing roles and responsibilities involved in data management, data flow, collection, and validation during the conduct of protocol # (b) (4)            **(Exhibit GKK # 26).**

Ms. Jones explained that a designated study site personnel transcribed data captured in source documents into the EDC eCRF system. Source data verification was performed at monitoring visits. Additional data review and cleaning including query generation and resolution was performed by the Data Management (DM) team.  Once the data was deemed accurate, the Principal Investigator (PI) signed off on each eCRF casebook. At this point, the eCRF is soft locked for further entry or edits.

I reviewed the EDC audit trail history and observed that the system captured user IDs, date/time of data entry, data changes, monitor source data verification events as well as DM data review and PI sign off events. I however, observed that each eCRF audit history did not capture audit trail data associated with when the data base was locked or when PI signature is invalidated when updates or edits are applied to an already PI signed/soft locked eCRF. Please see the **"General Discussion with Management"** section of this report for details.

I reviewed records documenting that all pre-data base lock requirements were completed and required approvals obtained before the data base was locked on 12/5/2019.

Ms. Jones explained that, the final raw datasets and the relevant data management documents are filed in Axsome's (b) (4). Axsome (b) (4) is hosted by (b) (4)    User access to the Axsome (b) (4)   account requires approval by Ms. Jones and unique login in credentials.

I verified that subject disposition, adverse events, primary endpoint efficacy data, and concomitant medication data documented in the eCRFs matched with corresponding data provided in the assignment data listings for sites (b) (7)(E)    . I did not observe any discrepancies.

*Protocol #* (b) (4)        *Randomization and Blinding Procedures*
Ms. Jones stated that to protect blinding, there was only two authorized unblinded individuals.(b) (4)
(b) (4)            ) and (b) (4)                    ). Ms. Jones explained that Ms. (b) (4) generated the required randomization sequence list per protocol specifications and e-mailed a password protected copy to Ms (b) (4).

**Establishment Inspection Report**                    FEI:          **3018815311**
Axsome Therapeutics, Inc.                              EI Start:        6/21/2021
New York, NY 10007-3139                                EI End:           7/1/2021

---

(b) (4)                      was contracted to prepare (b) (4)
(b) (4) **(Exhibit GKK # 10)**. Each (b) (4) was coded using a unique med # and linked to the randomized sequence list creating the final coded randomized sequence list. This was provided back to Ms. (b) (4) for verification. I reviewed e-mail correspondence between Ms. (b) (4) and Ms. (b) (4) and found no concerns.

The study used (b) (4) EDC IWRS system to perform subject randomization. At the randomization visit, the system assigned each subject a randomization number linking the subject to an assigned treatment allocation. At dosing visits, a pharmacist would input the required subject credentials and the system provided a printout documenting the med # to be dispensed to the subject.

I selected a random sample of subjects from sites (b) (7)(E)     and verified that the med #s dispensed to the subjects identified with the treatment assignment for each subject in the source randomization schedule. I also verified that randomization data provided in the data listings matched with that documented in the source randomization schedule. I did not observe any discrepancies.

Ms. Jones stated that there were no accidental or planned unblinding incidences throughout the conduct of the study. My review of the sponsor records did not reveal evidence to suggest otherwise.

**RECORD RETENTION**
No objectionable items were observed with respect to record retention during the inspection.

**FINANCIAL DISCLOSURE**
I reviewed financial disclosure records and found that the sponsor obtained and reported to the FDA financial disclosures from all principal investigators. None of the principal investigators participating in protocol # (b) (4)          or # (b) (4)          reported a financial conflict of interest.

I also confirmed that the sponsor collected financial disclosures for all sub-investigators documented in forms FDA 1572. I did not observe any discrepancies.

**ELECTRONIC RECORDS AND ELECTRONIC SIGNATURES**
(b) (4)      This is a commercial secure platform for organizing and sharing of confidential documents. Ms. Jones explained that Axsome used (b) (4)     to stored/archive all clinical documents for both protocol # (b) (4)          and # (b) (4)          including the eTMFs. Ms. Jones is the manager and has the authority to grant access to the Axsome (b) (4)    account. Unique log in credential are required for access.

*Clinical trial management system (CTMS):* Ms. Streicher, Senior director, clinical operations, explained that the commercial CTMS system used by Axsome was developed and managed by (b) (4)                                        She added that Axsome used the CTMS to perform clinical trial monitoring functions including report writing, review and approval for both protocol # (b) (4)          and # (b) (4)          Completed monitoring reports are downloaded and uploaded to (b) (4)

**Establishment Inspection Report**                                    FEI:              **3018815311**
Axsome Therapeutics, Inc.                                          EI Start:              6/21/2021
New York, NY 10007-3139                                            EI End:                7/1/2021

---

(b) (4)     : This was a custom developed software for Axsome by (b) (4)      (Exhibit GKK # 5). It was used to enable transcription of protocol # (b) (4)      paper CRFs into electronic documents. Ms. Jones sated that the finalized paper CRFs were electronically scanned and uploaded into (b) (4)

(b) (4) _Electronic Data Capture (EDC) system_: This is a commercial data management software developed by (b) (4)                                    . It is the EDC system used to capture electronic CRFs, subject randomization, tracking randomization and drug dispensing during the conduct of protocol # (b) (4)      Ms. Streicher explained that user access requests and approval was managed through the (b) (4) web based portal.

Application of relevant electronic systems for data collection and handling, user acceptance testing/validation, audit trail and security capabilities are further described in the **Data Collection and Handling** section of this report.

I did not observe any objectionable items related to the procedures in place for setup, user authorization, training, security or data back-up and recovery procedure.

**TEST ARTICLE**
Axsome Therapeutics Inc. contracted (b) (4)                                    to manufacture the investigational product, (b) (4) used in the conduct of both protocol # (b) (4)      and # (b) (4)          (b) (4)
(b) (4), was contracted to provide blinding, labelling, packaging, storage, and shipping services.

I obtained and reviewed certificate of analysis records documenting that the IP used in the conduct of protocol # (b) (4)      and # (b) (4)      met the required release specifications.

For protocol # (b) (4)      manufacturer lot numbers analyzed/certified include (b) (4) and (b) (4) (Active drug (b) (4)) and (b) (4)

For protocol # (b) (4)      manufacturer lot numbers analyzed/certified include, (b) (4) (Active drug (b) (4)) and (b) (4)          ).

Shipping records show that the IP was shipped from (b) (4) to (b) (4)          in (b) (4) where labeling, blinded coding and packaging into treatment kits was performed. Completed treatment kits were then shipped to a (b) (4)          located at (b) (4)        , (b) (4)          under controlled room temperature.

The (b) (4)                          served as the storage facility and dispatch point for IP shipping to study sites during the conduct of both protocol # (b) (4)      and # (b) (4)

The investigational brochure states that (b) (4) should be stored at temperatures not exceeding (b) (4). Statements from Ms. Jones and my review of storage facility memos indicated that the storage

**Establishment Inspection Report**  FEI:  **3018815311**
Axsome Therapeutics, Inc.  EI Start:  6/21/2021
New York, NY 10007-3139  EI End:  7/1/2021

---

facility unit was maintained at 20° C +/- 5° C. I reviewed temperature charts documenting minimum and maximum temperatures during shipping from (b) (4)       to (b) (4)                    , and at the storage facility during the conduct of # protocol # (b) (4)          and # (b) (4)                and found no concerns.

My review of depot to study site shipping records for both protocol # (b) (4)          and # (b) (4)          showed that shipping occurred overnight at room temperature. I reviewed records documenting that upon receipt, sites inspected, acknowledged, and reported to the sponsor that the IP was received in good condition.

I obtained and reviewed records documenting names and addresses of clinical investigators that the IP was shipped to. I observed that the records documented dates, quantity, and code marks associated with each shipment. I did not observe any concerns.

I reviewed packing slips, site receiving records, dispensing and unused drug return records for all four sites (protocol # (b) (4)          and the twelve sites selected for review (protocol # (b) (4)          I found that the sponsors records were sufficient to reconstruct and reconcile IP usage at the study sites. I did not observe any concerns.

Ms. Jones stated that none of the IP was recalled, withdrawn, or returned for any reason during the conduct of either protocol # (b) (4)          or # (b) (4)          My review of IP records did not reveal any evidence to suggest otherwise.

No objectionable items were observed with regard to labeling of the test article.

**DEVICES**
This is not a device study and therefore this section is not applicable to this inspection and report.

**EMERGENCY RESEARCH**
Ms. Jones stated that there was no emergency research use of (b) (4)

**OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE**
No objectionable items were observed and no form FDA 483, "Inspectional Observations", was issued during this inspection.

**REFUSALS**
No refusals were encountered.

**GENERAL DISCUSSION WITH MANAGEMENT**
The following five discussion items were presented to the management at the close out meeting held on 7/1/2021 and attended by:
- Herriot (NMI) Tabuteau: Chief Executive Officer
- Shelly G. Ogiste: Senior director, quality.
- Caroline P. Streicher: Senior director, clinical operations.

**Establishment Inspection Report**                          FEI:           **3018815311**

Axsome Therapeutics, Inc.                                    EI Start:        6/21/2021

New York, NY 10007-3139                                      EI End:          7/1/2021

---

- Amanda E. Jones: Senior vice president clinical development.
- Mark L. Jacobson: Chief operating officer.
- Cheryl A. Askew: Director, clinical operations.
- Kevin J. Laliberte: Executive vice president, product development

1. *Results and a copy of protocol #* (b) (4) *are not yet posted in clincaltrial.gov*
   My review of the current status of protocol # (b) (4) in clincaltrial.gov indicated that a summary of study results and a copy of the protocol have not yet been posted in clincaltrial.gov at the time of the current inspection **(Exhibit GKK # 27, Page 1 – 6)**. Study case report forms show it has been over 2.5 years since the date of the last visit for the final study subject (visit 9) which occurred on 12/27/2018 **(Exhibit GKK # 27, Page 7 – 8)**.

   Ms. Jones explained that the sponsor submitted a request for extension to the FDA around 3/18/2021. FDA declined to approve the request stating that the information provided does not appear sufficient to evaluate whether there is good cause for an extension **(Exhibit GKK # 27, page 9 – 10)**. She stated that the required document preparations are complete, and the required data will be posted in clinicaltrial.gov within 1 – 2 months period.

2. *100% of CRFs of the CRFs are not signed or initial and dated by the author.*
   Source records for protocol # (b) (4) were transcribed into paper Case Report Forms (CRFs) by site personnel. I observed that for all four study sites, 100% of the transcribed CRFs were not signed or initiated and dated by the individual completing the transcription. For example, **Exhibit GKK # 28.**

   Dr. Tabuteau acknowledged the oversight and indicated that mitigating corrective action will be implemented going forward.

3. *Case report forms for three subjects enrolled in protocol #* (b) (4) *have data changes that were entered after the principal investigator signed and dated the CRFs as follows.*
- Subject (b) (6) Casebook was signed by the PI on 10/17/2018. Data changes on page 43 "(b) (4) scores" are dated 10/18/2018 **(Exhibit GKK # 29, Page 1 – 2)**.

- Subjec (b) (6) : Casebook was signed by the PI on 10/18/2018. Data changes on page 19 "Study drug dispensation" are dated 11/30/2018 **(Exhibit GKK # 29, Page 3 – 4)**.

- Subject (b) (6): Casebook was signed by the PI on 9/25/2018. Data changes on page 3 "Medical and psychiatric history" are dated 9/26/2018 **(Exhibit GKK # 29, Page 5 – 6)**.

   Dr. Tabuteau acknowledged the oversight and indicated that mitigating corrective action will be implemented going forward.

4. *Two study monitors recruited and assigned monitoring duties for protocol #* (b) (4) *did not have a college degree and/ or 3 years of experience per the requirements set forth in the sponsor's job descriptions for study monitors (Exhibit GKK # 17).*

**Establishment Inspection Report**        FEI:        **3018815311**
Axsome Therapeutics, Inc.        EI Start:        6/21/2021
New York, NY 10007-3139        EI End:        7/1/2021

- Per (b) (6)        CV, he became a clinical trial assistant on 7/2018 and a research associates in August of 2019 (**Exhibit GKK # 30, Page 1**). Monitoring reports show that he conducted monitoring activities and wrote monitoring reports on 11/13/2019 for site (b) (7)(E) (**Exhibit GKK # 30, Page 2 – 8**) and on 10/24/2019 and site 807 (**Exhibit GKK # 30, Page 9 – 19**).

- (b) (6)        CV indicates the highest level of education attained is high school (**Exhibit GKK # 31, Page 8**). Monitoring reports show that he conducted monitoring activities and wrote monitoring reports for site (b) (7)(E) in numerous occasions (**Exhibit GKK # 31, Page 9 – 14**).

  Dr. Tabuteau acknowledged the oversight and indicated that mitigating corrective action will be implemented going forward.

5. *The (b) (4) EDC database system used to capture and maintain protocol # (b) (4) eCRFs does not have the capability to capture and maintain all eCRF audit trail history.*

- For example, eCRFs audit history lacks information on the database lock date/time and by whom (**Exhibit GKK # 32, Page 1 – 2**). Ms. Jones stated that the EDC system captured audit history data reflecting when locking procedures were applied to the full study database (**Exhibit GKK # 32, Page 3**). This data is not captured in individual subject casebooks.

- eCRF audit history did not capture data associated with PI signature invalidation when updates or edits are applied to an already signed eCRF (**Exhibit GKK # 38, Page 1**). The audit history captured the date and time when the PI's re-signs eCRFs, **Exhibit GKK # 38, Page 1**).

  Dr. Tabuteau acknowledged the oversight and indicated that mitigating corrective action will be implemented going forward.

**ADDITIONAL INFORMATION**
A USB drive containing the original copies of the files for the collected exhibits is attached to the report as **Exhibit GKK # 33.**



(b) (7)(E), (b) (7)(C)

**SAMPLES COLLECTED**
No samples were collected during this inspection.
**VOLUNTARY CORRECTIONS**

**Establishment Inspection Report**  FEI: **3018815311**

Axsome Therapeutics, Inc.  EI Start: 6/21/2021

New York, NY 10007-3139  EI End: 7/1/2021

---

No voluntary corrections were observed during this inspection.

**EXHIBITS COLLECTED**

GKK # 1: Opening meeting presentation                                        29

GKK # 2: Protocol # (b) (4)            (b) (4)        work agreements         09

GKK # 3: Protocol # (b) (4)            (b) (4)            work agreements     29

GKK # 4: Protocol # (b) (4)            (b) (4)             work agreements    07

GKK # 5: Protocol # (b) (4)            (b) (4)         . work agreements      07

GKK # 6: Protocol # (b) (4)            (b) (4)            work agreements     02

GKK # 7: Protocol # (b) (4)            & (b) (4)          . work agreements   38

GKK # 8: List of protocol # (b) (4)          third party contractors         01

GKK # 9: Protocol # (b) (4)            (b) (4)        work agreements         09

GKK # 10: Protocol # (b) (4)           (b) (4)      work agreements          10

GKK # 11: Protocol # (b) (4)           (b) (4) Database work agreements       08

GKK # 12: Protocol # (b) (4)           (b) (4) work agreements                19

GKK # 13: Protocol # (b) (4)           (b) (4)          work agreements       06

GKK # 14: Protocol # (b) (4)           (b) (4) work agreements                14

GKK # 15: Protocol # (b) (4)           (b) (4) work agreements                18

GKK # 16: Protocol # (b) (4)           Clincaltrial.gov extension approval    06

GKK # 17: Protocol # (b) (4)           &   (b CRA job descriptions            02

GKK # 18: Protocol # (b) (4)           Clinical trial monitoring plan         15

GKK # 19: Protocol # (b) (4)           Clinical trial monitoring plan         51

GKK # 20: (b) (4) investigational brochure                                   77

GKK # 21: Protocol (b) (4)           safety management plan                  31

GKK # 22: Protocol (b) (4)           safety management plan                  32

GKK # 23: Protocol (b) (4)           SAE reclassification                    39

GKK # 24: List of clinical studies included in (b) (4)        submission     05

GKK # 25: Protocol # (b) (4)           clinical data management plan          11

GKK # 26: Protocol # (b) (4)           clinical data management plan          17

GKK # 27: Protocol # (b) (4)           clinicaltrial.gov information          10

GKK # 28: Example unsigned CRFs Protocol # (b) (4)                           53

GKK # 29: Protocol # (b) (4)           changes to CRFs                        06

GKK # 30: (b) (6)        CV and Monitoring activities                         19

GKK # 31: (b) (6)          CV and Monitoring activities                       14

GKK # 32: (b) (4) database audit trail screen shots                          03

GKK # 33: USB Drive Containing Original Copies of Exhibits                    01

**ATTACHMENTS**

Attachment 1: Form FDA 482 issued on 6/21/2021 to Herriot (NMI) Tabuteau     03

Attachment 2: Assignment memo dated 5/4/2021                                 10

**Establishment Inspection Report**  FEI:  **3018815311**
Axsome Therapeutics, Inc.  EI Start:  6/21/2021
New York, NY 10007-3139  EI End:  7/1/2021

# Geoffrey K. Kilili -S

Digitally signed by Geoffrey K. Kilili -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=FDA, ou=People,
0.9.2342.19200300.100.1.1=2001340132,
cn=Geoffrey K. Kilili -S
Date: 2021.07.15 11:36:15 -04'00'