# Exhibit 2

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.)

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

# AXSOME THERAPEUTICS, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant) Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee paid previously with preliminary materials.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

TABLE OF CONTENTS



April 21, 2023

        You are cordially invited to attend the 2023 Annual Meeting of Stockholders of Axsome Therapeutics, Inc. (the "Annual Meeting") that will be held on Friday, June 2, 2023 at 9:00 a.m. local time. The Annual Meeting will be held virtually via means of remote communication. Stockholders will be able to attend the Annual Meeting, and submit questions, and vote their shares during the Annual Meeting, from any location that has internet connectivity. There will be no physical in-person meeting. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the enclosed Proxy statement.

        In accordance with the Securities and Exchange Commission rules allowing companies to furnish proxy materials to their stockholders over the Internet, we have sent stockholders of record at the close of business on April 10, 2023 a Notice of Internet Availability of Proxy Materials. The notice contains instructions on how to access our Proxy statement and Annual Report and vote online. If you would like to receive a printed copy of our proxy materials from us instead of downloading a printable version from the Internet, please follow the instructions for requesting such materials included in the notice, as well as in the attached Proxy statement.

        Attached to this letter are a Notice of Annual Meeting of Stockholders and Proxy statement, which describe the business to be conducted at the meeting.

        Your vote is important to us. Please act as soon as possible to vote your shares. It is important that your shares be represented at the meeting whether or not you plan to attend the annual meeting. Please vote electronically over the Internet, by telephone, or if you receive a paper copy of the proxy card by mail, by returning your signed proxy card in the envelope provided. We encourage you to vote by proxy so that your shares will be represented and voted at the meeting, whether or not you can attend.

        Thank you for your ongoing support of Axsome.

        Very truly yours,

                                                        /s/ HERRIOT TABUTEAU, M.D.

                                                        Herriot Tabuteau, M.D.
                                                        *Chief Executive Officer, President, and Chairman of the Board*

TABLE OF CONTENTS

**CORPORATE GOVERNANCE**

**Code of Business Conduct and Ethics**

We have adopted a code of business conduct and ethics that applies to all of our employees, officers, and directors, including those officers responsible for financial reporting. Our code of business conduct and ethics is available on our website at www.axsome.com. We intend to disclose any amendments to the code, or any waivers of its requirements, on our website. We intend to disclose, to the extent required by applicable rules and regulations, future amendments to, or waivers of, our code of ethics and business conduct, at the same location on our website identified above and also in public filings we will make with the SEC. Information contained on our website is not incorporated by reference into this proxy, and you should not consider information contained on our website to be part of this proxy or in deciding whether to purchase shares of our common stock.

**Board Composition**

Our Board of Directors currently consists of four members, each of whom is elected pursuant to the board composition provisions of our amended and restated certificate of incorporation. Our Nominating and Corporate Governance Committee and Board of Directors may consider a broad range of factors relating to the qualifications and background of nominees, which may include diversity, which is not only limited to race, gender identity, sexual orientation, or national origin. We have no formal policy regarding board diversity. Our Nominating and Corporate Governance Committee's and Board of Directors' priority in selecting board members is identification of persons who will further the interests of our stockholders through his or her established record of professional accomplishment, the ability to contribute positively to the collaborative culture among board members, and professional and personal experiences and expertise relevant to our growth strategy.

**Director Independence**

Under the listing requirements and rules of the Nasdaq Global Market, or Nasdaq, independent directors must compose a majority of a listed company's Board of Directors within a one-year period following the completion of its initial public offering. In addition, applicable Nasdaq rules require that, subject to specified exceptions, each member of a listed company's audit, compensation, and Nominating and Corporate Governance Committees must be independent within the meaning of applicable Nasdaq rules. Audit Committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Exchange Act.

Our Board of Directors undertook a review of the independence of each director and considered whether any director has a material relationship with us that could compromise his or her ability to exercise independent judgment in carrying out his or her responsibilities. In making this determination, our Board of Directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our Board of Directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each non-employee director and the association of our directors with the holders of more than 5% of our common stock.

As a result of this review, our Board of Directors determined that Dr. Coleman, Dr. Jeffs and Mr. Saad qualify as "independent" directors within the meaning of the Nasdaq rules. Nasdaq rules require that a majority of the Board of Directors and each member of our Audit, Compensation, and Nominating and Corporate Governance Committees be independent. We believe we are compliant with these independence requirements. As required under applicable Nasdaq rules, we anticipate that our independent directors will meet in regularly scheduled executive sessions at which only independent directors are present. There are no family relationships among any of our directors or executive officers.

Audit Committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Exchange Act. In order to be considered independent for purposes of Rule 10A-3, a member of an Audit Committee of a listed company may not, other than in his or her capacity as a member of the Audit Committee, the Board of Directors, or any other board committee, accept, directly or indirectly, any consulting, advisory, or other compensatory fee from the listed company or any of its subsidiaries, or be an affiliated person of the listed company or any of its subsidiaries. Each of Dr. Coleman, Dr. Jeffs and Mr. Saad qualify as an independent director pursuant to Rule 10A-3.

21

TABLE OF CONTENTS

**Board Leadership Structure**

The positions of Chief Executive Officer and Chairman of the Board are both currently held by Dr. Tabuteau. Our Board of Directors has also appointed a Lead Director, Dr. Coleman. The Lead Director's responsibilities include: (1) coordinating the scheduling and preparation of agendas for the executive sessions of the Board of Directors and other meetings of the Board of Directors in the absence of the Chairman of the Board; (2) chairing executive sessions of the Board of Directors and other meetings of the Board of Directors in the absence of the Chairman of the Board; (3) approving information sent to the Board of Directors; (4) serving as a liaison between the Chairman of the Board and the other independent directors; (5) approving the meeting agendas for the board and approving the meeting schedules of the Board of Directors to assure that there is sufficient time for discussion of all agenda items; and (6) if requested by major stockholders, ensuring that he or she will be available for consultation and direct communication  with such major stockholders. The Lead Director has the authority to call meetings of the independent directors. Our Board of Directors believes that this combined role of Chairman and Chief Executive Officer, coupled with a Lead Director, is currently the most effective leadership structure for our company and is in the best interests of our stockholders. In considering its leadership structure, our Board of Directors believes that the combined roles of Chairman and Chief Executive Officer are appropriately balanced by the designation of a Lead Director with substantive responsibilities, the majority of independent directors that comprise the board of our directors, and our company's strong corporate governance policies and procedures.

We have a separate chair for each committee of our Board of Directors. The chairs of each committee are expected to report annually to our Board of Directors on the activities of their committee in fulfilling their responsibilities as detailed in their respective charters or specify shortcomings, if any.

Our Board of Directors has concluded that our current leadership structure is appropriate at this time. However, our Board of Directors will continue to periodically review our leadership structure and may make such changes in the future as it deems appropriate.

**Board Committees**

Our Board of Directors has established an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee, each of which operates pursuant to a charter adopted by our Board of Directors. The composition and functioning of all of our committees complies with all applicable requirements of the Sarbanes-Oxley Act of 2002, Nasdaq and SEC rules and regulations.

*Audit Committee.* Dr. Coleman, Dr. Jeffs and Mr. Saad currently serve on the Audit Committee, which is chaired by Mr. Saad. Our Board of Directors has determined that each of the members of our Audit Committee satisfies Nasdaq and SEC independence requirements, and that Mr. Saad qualifies as an Audit Committee financial expert within the meaning of SEC regulations and meets the financial sophistication requirements of the Nasdaq listing standards. The Audit Committee operates under a written charter that satisfies the applicable standards of the SEC and Nasdaq and which is available on our website at www.axsome.com. The inclusion of our website address here and elsewhere in this proxy does not include or incorporate by reference the information on our website into this proxy. Our Audit Committee met four times during the year ended December 31, 2022. The Audit Committee's responsibilities include:

- appointing, approving the compensation of, and assessing the independence of our independent registered public accounting firm;

- pre-approving auditing and permissible non-audit services, and the terms of such services, to be provided by our independent registered public accounting firm;

- reviewing the overall audit plan with the independent registered public accounting firm and members of management responsible for preparing our financial statements;

- reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures as well as critical accounting policies and practices used by us;

- coordinating the oversight and reviewing the adequacy of our internal control over financial reporting;

- establishing policies and procedures for the receipt and retention of accounting-related complaints and concerns;

- recommending based upon the Audit Committee's review and discussions with management and the independent registered public accounting firm whether our audited financial statements shall be included in our Annual Report on Form 10-K;

- monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to our financial statements and accounting matters;

- preparing the Audit Committee report required by SEC rules to be included in our annual proxy statement;

- reviewing all related person transactions for potential conflict of interest situations and approving all such transactions; and

- reviewing quarterly earnings releases.

22

TABLE OF CONTENTS

*Compensation Committee.* Dr. Coleman, Dr. Jeffs and Mr. Saad currently serve on the Compensation Committee, which is chaired by Dr. Coleman. Our Board of Directors has determined that each of the members of our Compensation Committee satisfies Nasdaq and SEC independence requirements. The Compensation Committee operates under a written charter that satisfies the applicable standards of Nasdaq and which is available on our website at www.axsome.com. The inclusion of our website address here and elsewhere in this proxy does not include or incorporate by reference the information on our website into this proxy. Our Compensation Committee met in person, by videoconference or by phone five times during the year ended December 31, 2022. The Compensation Committee's responsibilities include:

- annually reviewing and making recommendations to the Board of Directors with respect to corporate goals and objectives relevant to the compensation of our chief executive officer;

- evaluating the performance of our chief executive officer in light of such corporate goals and objectives and making recommendations to the Board of Directors with respect to the compensation of our chief executive officer;

- reviewing and approving the compensation of our other executive officers;

- reviewing and establishing our overall management compensation, philosophy and policy;

- overseeing and administering our compensation and similar plans;

- reviewing and approving our policies and procedures for the grant of equity-based awards;

- reviewing and making recommendations to the Board of Directors with respect to director compensation;

- reviewing and discussing with management the compensation discussion and analysis to be included in our annual proxy statement or Annual Report on Form 10-K;

- reviewing and discussing with the Board of Directors corporate succession plans for the chief executive officer and other key officers; and

- hiring third party compensation consultants to review and make recommendations on the compensation of directors, executive officers and other key officers.

During the fiscal years ended December 31, 2022 and December 31, 2021, our Compensation Committee retained Frederic W. Cook & Co. Inc., or FW Cook, to review our compensation program and to provide them with independent compensation data and analysis. In connection with this analysis, FW Cook and the Compensation Committee reviewed each component of compensation paid to our non-employee directors and executive officers against comparable positions at companies that were determined by FW Cook to be similar in scope of operation to Axsome. FW Cook reports directly and exclusively to the Compensation Committee. Our Compensation Committee analyzed whether the work of FW Cook as a compensation consultant has raised any conflict of interest, and, based on its analysis, determined that the work of FW Cook and the individual compensation advisors employed by FW Cook as compensation consultants has not created any conflict of interest and the Compensation Committee is satisfied with the independence of FW Cook.

*Nominating and Corporate Governance Committee.* Dr. Coleman, Dr. Jeffs and Mr. Saad currently serve on the Nominating and Corporate Governance Committee, which is chaired by Dr. Jeffs. Our Board of Directors has determined that each member of the Nominating and Corporate Governance Committee is "independent" as defined in applicable Nasdaq rules. The Nominating and Corporate Governance Committee operates under a written charter that satisfies the applicable standards of Nasdaq and which is available on our website at www.axsome.com. The inclusion of our website address here and elsewhere in this proxy does not include or incorporate by reference the information on our website into this proxy. Our Nominating and Corporate Governance Committee met once during the year ended December 31, 2022. The Nominating and Corporate Governance Committee's responsibilities include:

- developing and recommending to the Board of Directors criteria for board and committee membership;

- establishing procedures for identifying and evaluating board of director candidates, including nominees recommended by stockholders;

- reviewing the size and composition of the Board of Directors to ensure that it is composed of members containing the appropriate skills and expertise to advise us;

- identifying individuals qualified to become members of the Board of Directors;

- recommending to the Board of Directors the persons to be nominated for election as directors and to each of the board of director's committees;

- developing and recommending to the Board of Directors a code of business conduct and ethics and a set of corporate governance guidelines;

- developing a mechanism by which violations of the code of business conduct and ethics can be reported in a confidential manner; and

- overseeing the evaluation of the Board of Directors and management.

Our Board of Directors may from time to time establish other committees.

23

TABLE OF CONTENTS

**Compensation Committee Interlocks and Insider Participation**

None of the members of our Compensation Committee has at any time during the prior three years been one of our officers or employees. None of our executive officers currently serves, or in the past fiscal year has served, as a member of the Board of Directors or Compensation Committee of any entity that has one or more executive officers serving on our Board of Directors or Compensation Committee.

**Meetings of the Board of Directors**

The full Board of Directors met in person, by videoconference or by phone five times during the year ended December 31, 2022 and also acted via unanimous written consent multiple times during the year as needed. No director attended fewer than 75% of the total number of meetings of the Board of Directors and of any committees of the Board of Directors of which he or she was a member during our fiscal year ended December 31, 2022.

It is our policy that directors are invited and encouraged to attend our annual meetings of stockholders.

**Board Oversight of Risk**

Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. We face a number of risks, including risks relating to our operations, strategic direction and intellectual property as more fully discussed under the section entitled "Risk Factors" in our most recent Annual Report on Form 10-K. Management is responsible for the day-to-day management of risks we face, while our Board of Directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The role of the Board of Directors in overseeing the management of our risks is conducted primarily through committees of the Board of Directors, as disclosed in the descriptions of each of the committees above and in the charters of each of the committees. For example, our Audit Committee is responsible for overseeing the management of risks associated with our financial reporting, accounting and auditing matters, and regulatory and legal compliance; our Compensation Committee oversees major risks associated with our compensation policies and programs; and our nominating and governance committee oversees the management of risks associated with director independence, conflicts of interest, composition and organization of our Board of Directors and director succession planning. The full Board of Directors (or the appropriate board committee in the case of risks that are under the purview of a particular committee) discusses with management our major risk exposures, their potential impact on Axsome, and the steps we take to manage them. When a board committee is responsible for evaluating and overseeing the management of a particular risk or risks, the chairman of the relevant committee reports on the discussion to the full Board of Directors during the committee reports portion of the next board meeting. This enables the Board of Directors and its committees to coordinate the risk oversight role, particularly with respect to risk interrelationships.

**Commitment to Corporate Responsibility**

Axsome's corporate responsibility is fundamental to our long-term success. It is also now more than ever important to our stakeholders. We have a commitment to environmental, social and governance ("ESG") issues.

**Environmental Factors**: As we continue to expand our operations, we have initiated certain projects to begin tracking our environmental impact, and where feasible, have taken measures to increase our sustainability efforts. Some of our efforts include our commitment to reduce, reuse or recycle where possible or appropriate, and energy efficient projects to lower energy use within our office areas.

**Social Factors**: Our future performance depends significantly upon the continued service of our key employees and personnel and our continued ability to attract and retain highly skilled employees. We provide our employees with competitive salaries and bonuses, opportunities for equity ownership, development programs that enable continued learning and growth and a robust employment package that promotes well-being across all aspects of their lives. In addition to salaries, these programs include potential annual discretionary bonuses for our non-sales staff, potential quarterly incentive compensation for our sales staff, stock awards, a 401(k) plan which includes employer contributions, healthcare and insurance benefits, health savings and flexible spending accounts, paid time off, family leave, and flexible work schedules, among other benefits.

24

TABLE OF CONTENTS

**Compensation Policies and Practices at a Glance**

In executing our compensation program and determining executive compensation, we are guided by our executive compensation best practices:

| What we do | What we don't do |
|---|---|
| ☑ Practice pay-for-performance, under which a significant percentage of our NEO compensation is at-risk and may not be realized if corporate and individual performance goals are not achieved | X Executives are prohibited from hedging or pledging our stock |
| ☑ Set challenging incentive plan goals | X The Compensation Committee's independent consultant performs no other work for the Company |
| ☑ Review our peer group annually and engage in annual benchmarking to align our executive compensation program with the market | X No guaranteed annual bonuses or guaranteed salary increases |
| ☑ Offer market-competitive benefits for NEOs that are consistent with the rest of our employees | X No severance benefits can be triggered automatically upon a change in control (i.e. all change in control provisions are "double trigger") |
| ☑ Having a pre-established grant date practice for approving executive officer's equity pay | X No excise tax gross-ups for any change-in-control payments |
| ☑ Maintain an independent Compensation Committee | X Repricing of stock options is prohibited without shareholder approval |
| ☑ Consult with an independent compensation advisor on compensation levels and practices | X No excessive personal perquisites, such as automobile leases, country club memberships or personal use of aircraft |
| ☑ Maintain clawback and forfeiture provisions on our incentive awards | X No supplemental executive retirement plans |

**Compensation Objectives and Philosophy**

Our NEO compensation program is designed principally to:

- attract, motivate, and retain talented and dedicated NEOs;

- correlate annual cash bonuses to the achievement of operational and financial objectives; and

- provide our NEOs with appropriate long-term incentives that directly correlate to the enhancement of stockholder value, as well as facilitate executive retention.

To achieve these objectives, we establish (i) annual base salaries at levels that we believe are competitive with base salaries of executive officers in other comparable publicly-held biopharmaceutical companies, (ii) year-end annual cash bonuses based on the achievement of key operational, commercial, clinical strategic and other performance goals, and (iii) grant annual equity awards as a retention tool and to align the NEOs' long-term interests with those of our stockholders. Our Compensation Committee does not have any formal policies for allocating compensation among the foregoing three components. Rather, our Compensation Committee uses its judgment to determine the appropriate level and mix of compensation on an annual basis with the goal to balance current cash compensation with equity awards to reward both short-term and long-term performance.

31

TABLE OF CONTENTS

**Roles and Responsibilities**

The Compensation Committee has engaged Frederic W. Cook & Co., Inc. ("FW Cook") as its independent compensation consultant. The Compensation Committee, FW Cook, and our CEO participated in a collaborative process to determine the compensation that our NEOs were granted and earned in 2022 (with the exception of our CEO's compensation, which was evaluated solely by the Compensation Committee, based upon the advice of FW Cook):

| Responsible Party | Primary Role and Responsibilities Relating to Compensation Decisions |
| --- | --- |
| Compensation Committee (composed solely of independent, non-employee Directors and reports to the Board)[1] | • Oversees the executive compensation program, policies, and practices, taking into account business goals and strategies, legal and regulatory developments, and evolving best practices;<br>• Approves performance goals for purposes of compensation decisions for the NEOs;<br>• Conducts an annual evaluation of the CEO's performance in consultation with the full Board and determines his compensation;<br>• Reviews and approves the CEO's recommendations for compensation for the other NEOs and senior executives, making changes when deemed appropriate;<br>• Approves all changes to the composition of the peer group; and<br>• Reviews and makes recommendations to the Board with respect to Director compensation. |
| Independent Consultant to the Compensation Committee (FW Cook)[2] | • Provides the Compensation Committee with analysis and advice pertaining to CEO, executive, and Director compensation program design, including industry survey analysis, explanation of current and developing best practices, and regulatory changes;<br>• Recommends a relevant group of peer companies and appropriate sources of survey data against which to compare the competitiveness and structure of CEO, executive, and Director compensation;<br>• Analyzes peer companies' CEO, executive, and Director compensation annually to assist the Compensation Committee in determining the appropriateness and competitiveness of compensation;<br>• Reviews and advises on any proposed changes to CEO, executive, and Director compensation program design;<br>• Reviews and assists with compensation disclosure materials; and<br>• Provides specific analysis and advice periodically as requested by the Compensation Committee. |
| CEO | • The CEO recommends to the Compensation Committee annual compensation for the other NEOs and senior executives based on his assessment of their performance; and<br>• The CEO works with the Compensation Committee Chair to set agendas, prepare materials for Compensation Committee meetings, and generally attends meetings, as appropriate.<br><br>No member of management is present in Compensation Committee meetings when matters related to his or her individual compensation is under discussion, when the Compensation Committee is approving or deliberating on CEO compensation, or when the Compensation Committee otherwise meets in executive session. |

(1) Our Board of Directors has determined that each member of our Compensation Committee is "independent" as that term is defined by applicable Nasdaq rules and is a "non-employee" director as defined under Section 16 of the Exchange Act.

(2) During 2022, the Compensation Committee was assisted by its independent compensation consultant FW Cook. Other than the support that it provided to the Compensation Committee, FW Cook provided no other services to the Company or management and only received fees from the Company for the services provided to the Compensation Committee. The Compensation Committee conducted an evaluation of the independence of FW Cook considering the relevant regulations of the SEC and the Nasdaq listing standards. The Compensation Committee concluded that FW Cook was independent of management and the services performed by FW Cook and the individual compensation advisors employed by FW Cook raised no conflicts of interest.

32

TABLE OF CONTENTS

The Compensation Committee decided to utilize the same performance measures for the 2023 annual incentive plan, and to only slightly modify the weightings of three of the measures as follows:

| Approved Performance Measure | Weight |
|---|---|
| Advance Our Pipeline | 30% |
| Drive Business Performance | 30% |
| Drive Business Expansion | 20% |
| Increase Awareness of Our Science, Business, and Products | 20% |

**Equity Incentive Compensation**

We believe that successful long-term corporate performance is more likely to be achieved with a corporate culture that encourages a long-term focus by our NEOs and other employees through the use of equity awards, the value of which depends on our stock performance. We established the 2015 Plan to provide all of our employees, including our NEOs, with incentives to help align our employees' interests with the interests of our stockholders and to enable them to participate in the long-term appreciation of our stockholder value.

Additionally, equity awards provide an important retention tool for all employees, as the awards generally vest over four years following the grant date.

Typically, we grant equity awards upon an employee's hire. In addition, equity awards may also be granted on an annual or more frequent basis depending on position, performance, and tenure at the Company.

The determination of whether to grant equity, as well as the size of such grants, to our NEOs involves subjective assessments by the Compensation Committee and our Board of Directors and, with respect to NEOs other than himself, our CEO. Generally, annual equity awards are driven by our desire to retain and motivate our NEOs, and we consider individual performance and contributions during the preceding year to the extent the Compensation Committee and our Board of Directors believe such factors are relevant. As with base salary and cash bonuses, in evaluating and determining equity grants to our NEOs, the Compensation Committee and our Board of Directors also consider publicly available data prepared by FW Cook at the request of the Compensation Committee from other similar companies identified by the Compensation Committee.

We have no program, practice, or plan to grant equity awards in coordination with the release of material nonpublic information. We also have not timed the release of material nonpublic information for the purpose of affecting the value of equity awards or other compensation, and we have no plan to do so. Generally, the Compensation Committee approves the grant of annual equity awards to our NEOs on the third trading day following the filing of our Annual Report on Form 10-K. Additionally, our option and restricted stock unit ("RSU") awards are subject to adjustment or recovery in connection with any breach of any restrictive covenant agreement between the recipient and the Company or if the participant otherwise engages in activities that constitute "cause" either while employed by, or providing service to, the Company or within a specified period of time thereafter. All equity awards are also subject to our insider trading policy and shall be subject to any applicable clawback or recoupment policies, additional share trading policies, or other policies that may be implemented by the Board from time to time.

For 2022, the Compensation Committee approved annual equity awards to NEOs. To promote retention and provide a balanced portfolio of equity vehicles, as well as to better align with practices of companies with similar market capitalizations to our size as of the time of approval, the Compensation Committee determined to award a portion of the annual equity awards in the form of restricted stock units, or RSUs, as well as stock options. The NEOs' annual equity grants were comprised of approximately 33% RSUs and 67% stock options, based on their grant date fair values. The RSUs vest in four even annual increments beginning on the first anniversary of grant. Additionally, the vested RSUs are subject to a post-vest holding period whereby the vested shares are delivered seven years after the date of grant. The stock options vest in 16 even quarterly increments over four years and have a ten-year term. These equity awards were granted on the third trading day following the filing of our Annual Report on Form 10-K, which was filed with the SEC on March 1, 2022. As such, the exercise price of $29.91 per share of the options was the closing price of our common stock on March 4, 2022.

| Name | Grant Date | Stock Options Granted | RSUs Granted | Grant Date Fair Value |
|---|---|---|---|---|
| Herriot Tabuteau, M.D. | 3/4/2022 | 209,655 | 110,861 | $ 7,001,434 |
| Nick Pizzie, C.P.A., M.B.A. | 3/4/2022 | 77,872 | 41,176 | $ 2,600,516 |
| Mark Jacobson, M.A. | 3/4/2022 | 89,405 | 47,990 | $ 3,000,581 |
| Hunter Murdock, Esq. | 3/4/2022 | 52,383 | 27,698 | $ 1,749,311 |

35

TABLE OF CONTENTS

**Other Aspects of Our Compensation Program**

*Retirement Plans, Perquisites and Other Personal Benefits*

Our NEOs are eligible to participate in the employee benefit plans on the same terms and conditions as they are available to our other regular employees. These benefits include medical, dental, vision, disability and life insurance, flexible spending accounts, and a 401(k) plan.

Under the tax-qualified employee savings and retirement plan, our 401(k) plan, all eligible U.S. employees, including our NEOs, may elect to defer a percentage of their eligible compensation, subject to the annual IRS limit. Beginning in 2021, we match 50% of a participant's contributions to the 401(k) plan of the first 6% of their eligible compensation up to an annual maximum of $5,000. Other than the 401(k) plan, we do not sponsor or maintain any pension benefits, nonqualified defined contribution or other nonqualified deferred compensation plans for our NEOs.

We do not provide perquisites or other personal benefits to our NEOs other than those that we provide to our employees. We do not provide any tax reimbursement payments (including "gross-ups") on any personal benefits, except in the case of certain relocation benefits.

*Employment and Severance Agreements*

We have entered into an employment agreement with our Chief Financial Officer, Nick Pizzie. Mr. Pizzie's employment agreement includes a severance provision that in the event we terminate his employment without "cause" within 12 months following a "change in control" of the Company, he will be eligible to receive severance payments equal to six months of his then existing base salary. Our other NEOs are not party to employment agreements with the Company.

**Insider Trading Policy**

Our insider trading policy prohibits short sales and derivative transactions of our stock by our named executive officers, directors and all of our employees, including short sales of our securities, including short sales "against the box"; purchases or sales of puts, calls or other derivative securities of the Company or any derivative securities that provide the economic equivalent of ownership of any of our securities or an opportunity, direct or indirect, to profit from any change in the value of our securities; or other hedging or monetization transactions accomplished through the use of prepaid variable forwards, equity swaps, collars and exchange funds. In addition, our insider trading policy prohibits our named executive officers, directors and all of our employees from purchasing our securities on margin, borrowing against Company securities held in a margin account, or pledging our securities as collateral for a loan.

**Clawback and Forfeiture**

Our equity awards provide that if a plan participant breaches any restrictive covenant agreement with the Company or otherwise engages in activities that constitute "cause" (as defined in the agreements) either while employed or within two years after employment, the applicable award will terminate, and the Company may rescind any stock option exercise or vesting or settlement of shares subject to other awards, on such terms as the Committee determines, including the right to require that in the event of any such rescission, the participant return to the Company the shares received upon the exercise or settlement, or pay to the Company the amount of any gain realized or payment received as a result of any sale or other disposition of the shares, net of the price originally paid by the participant for the shares. Our equity awards are also subject to any future clawback or recoupment policies that may be implemented by the Board from time to time. Additionally, we are subject to the clawback provisions of Section 304 of the Sarbanes-Oxley Act and Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations promulgated thereunder. When applicable, we will comply with the Nasdaq listing standards regarding the implementation of Exchange Act Rule 10D-1, which requires public companies to implement "clawback" policies providing for the recovery of incentive-based compensation in the event of a required accounting restatement.

**Compensation Committee Interlocks and Insider Participation**

During 2022, no member of the Compensation Committee served as one of our officers, former officers, or employees. During 2022, none of our named executive officers served as a member of the Compensation Committee of any other entity, one of whose executive officers served as a member of our Board of Directors or Compensation Committee, and none of our named executive officers served as a member of the Board of Directors of any other entity.

36

TABLE OF CONTENTS

**Compensation Committee Report**

The Compensation Committee of our Board of Directors has reviewed and discussed with management the section captioned "Compensation Discussion and Analysis" and based on such review and discussions, the Compensation Committee recommended to our Board of Directors that this "Compensation Discussion and Analysis" be included in this proxy statement.

Submitted by the Compensation Committee of the Board of Directors:

*Mark Coleman, M.D. (Chair)*
*Roger Jeffs, Ph.D.*
*Mark Saad*

37

TABLE OF CONTENTS

## Summary Compensation Table

The following table provides information concerning the compensation paid to our Chief Executive Officer, Chief Financial Officer, Chief Operating Officer and General Counsel for the fiscal years ended December 31, 2022, December 31, 2021 and December 31, 2020. We refer to these individuals as our named executive officers ("NEOs").

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(1) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) (3) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Herriot Tabuteau, M.D. | 2022 | 685,000 | — | 2,311,451 | 4,689,982 | 616,500 | — | 19,468 | 8,322,401 |
| *Chief Executive Officer,* | 2021 | 685,000 | — | 2,333,251 | 4,666,355 | 349,350 | — | 20,675 | 8,054,631 |
| *President and Chairman of the Board* | 2020 | 575,000 | — | 1,615,860 | 4,665,329 | 448,500 | — | —  (4) | 7,304,689 |
| Nick Pizzie, C.P.A., M.B.A. | 2022 | 451,000 | — | 858,520 | 1,741,997 | 270,600 | — | 11,341 | 3,333,458 |
| *Chief Financial Officer* | 2021 | 409,000 | — | 866,617 | 2,808,123 | 139,060 | — | 5,910 | 4,228,710 |
| | 2020 | 375,000 | — | 461,629 | 1,333,376 | 195,000 | — | — | 2,365,005 |
| Mark Jacobson, M.A. | 2022 | 483,000 | — | 1,000,591 | 1,999,990 | 289,800 | — | 11,861  (4) | 3,785,242 |
| *Chief Operating Officer* | 2021 | 409,000 | — | 999,938 | 3,240,166 | 139,060 | — | 6,660  (4) | 4,794,824 |
| | 2020 | 375,000 | — | 461,629 | 1,333,376 | 195,000 | — | —  (4) | 2,365,005 |
| Hunter Murdock, Esq. | 2022 | 450,000  (5) | — | 577,503  (5) | 1,171,808  (5) | 270,000  (5) | — | 15,388 | 2,484,699 |
| *General Counsel* | 2021 | 350,000 | — | 6,415 | 12,810 | 5,206 | — | — | 374,431 |

(1)  Represents cash incentive payments made under our annual incentive plans, paid in March following completion of the applicable performance year.
(2)  In accordance with SEC rules, this column reflects the aggregate grant date fair value of the RSU / option awards granted computed in accordance with Financial Accounting Standard Board Accounting Codification Topic 718 for stock-based compensation transactions (ASC 718), as applicable. Assumptions used in the calculation of these amounts are included in Note 2 to our financial statements. These amounts do not reflect the actual economic value that will be realized by the named executive officer upon the vesting of the stock options, the exercise of the stock options, or the sale of the common stock underlying such stock options.
(3)  Represents NEO's portion of FICA and FUTA tax payments paid by the Company on behalf of the NEO due to delayed settlement of corresponding RSUs.
(4)  Includes company contributions under the 401(k) match program described for the NEO consistent with those provided to all of our employees.
(5)  Mr. Murdock was hired in December 2021, and therefore, he did not receive a full year salary and non-equity incentive plan compensation and full year value of stock and option awards with the Company.

## *Equity Compensation*

## 2022 Grants of Plan-Based Awards

In 2022, we granted the following non-equity incentive awards, stock options and RSUs to our NEOs under our 2015 Plan:

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards* Threshold | Target | Maximum | Number of Shares of Stock or Units (#) (RSUs)(1) | Number of Securities Underlying Options (#) (2) | Exercise or Base Price of Option Awards ($/Share) | Grant Date Fair Value of Stock and Option Awards ($) (3) |
|---|---|---|---|---|---|---|---|---|
| Herriot Tabuteau, M.D. | | $ — | $ 411,000 | $ 822,000 | | | | |
| | 3/4/2022 | | | | 110,861  (4) | 209,655  (5) | $ 29.91 | $ 7,001,434 |
| Nick Pizzie, C.P.A., M.B.A. | | $ — | $ 180,400 | $ 360,800 | | | | |
| | 3/4/2022 | | | | 41,176  (4) | 77,872  (1)(5) | $ 29.91 | $ 2,600,516 |
| Mark Jacobson, M.A. | | $ — | $ 193,200 | $ 386,400 | | | | |
| | 3/4/2022 | | | | 47,990  (4) | 89,405  (1)(5) | $ 29.91 | $ 3,000,581 |
| Hunter Murdock, Esq. | | $ — | $ 180,000 | $ 360,000 | | | | |
| | 3/4/2022 | | | | 27,698  (4) | 52,383  (1)(5) | 29.91 | $ 1,749,311 |

*    Actual amounts set forth in the summary compensation table set forth above.
(1)  Represents shares of common stock, each of which vest over time.
(2)  Represents shares of our common stock underlying options awarded, each of which vest over time.
(3)  Represents the fair value of each equity award on the date of grant, as computed in accordance with FASB ASC 718.
(4)  25% of the RSU award vests on the one (1) year anniversary of the date of grant. The remaining RSUs substantially will vest in three substantially equal annual installments such that the RSUs will be fully vested on March 4, 2026.  Vested shares will be delivered to the reporting person upon the earlier of (i) the closing of a Change in Control (as defined in the 2015 Plan), (ii) the NEO's separation of service, (iii) NEO's death or disability, or (iv) seven years from the date of grant.
(5)  The option awards vest in substantially equal quarterly installments over four years such that the options will be fully vested on March 4, 2026.

38

TABLE OF CONTENTS

**Outstanding Equity Awards as of December 31, 2022**

The following table sets forth information regarding each outstanding and unexercised option and RSU held by each of our NEOs as of December 31, 2022. The number of shares subject to each award and, where applicable, the exercise price per share, reflect all changes as a result of our capitalization adjustments.

The vesting and exercisability schedule applicable to each outstanding award is described in the footnotes to the table below.

| | | Option Awards | | | | Stock Awards | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock that have not Vested (#) | Market Value of Shares or Units of Stock that have not Vested ($) |
| Herriot Tabuteau, M.D. | 5/27/2016 | 524,000 | — | $ 8.02 | 5/26/2026 | | |
| | 3/15/2017 | 149,000 | — | $ 4.95 | 3/14/2027 | | |
| | 3/12/2018 | 187,628 | — | $ 2.85 | 3/11/2028 | | |
| | 3/19/2019 | 299,262 | 19,950 (3) | $ 12.95 | 3/18/2029 | | |
| | 10/10/2019 | 60,233 | 8,604 (4) | $ 17.61 | 10/9/2029 | | |
| | 3/17/2020 | 116,036 | 52,740 (5) | $ 45.14 | 3/16/2030 | | |
| | 3/17/2020 | | | | | 25,845 (8)(9) | $ 1,993,425 |
| | 3/05/2021 | 42,506 | 54,649 (10) | $ 65.02 | 3/04/2031 | | |
| | 3/05/2021 | | | | | 38,786 (1) | $ 2,991,564 |
| | 3/4/2022 | 39,311 | 170,344 (2) | | 3/3/2032 | | |
| | 3/4/2022 | | | | | 110,681 (13) | $ 8,550,709 |
| Nick Pizzie, C.P.A., M.B.A. | 5/16/2018 | 132,000 | - | $ 3.50 | 5/15/2028 | | |
| | 3/19/2019 | 70,409 | 4,693 (3) | $ 12.95 | 3/18/2029 | | |
| | 10/10/2019 | 22,589 | 3,224 (4) | $ 17.61 | 10/9/2029 | | |
| | 3/17/2020 | 33,165 | 15,072 (5) | $ 45.14 | 3/16/2030 | | |
| | 3/17/2020 | | | | | 7,383 (9)(12) | $ 569,451 |
| | 3/05/2021 | 15,788 | 20,298 (10) | 65.02 | 3/04/2031 | | |
| | 3/05/2021 | | | | | 14,406 (1) | $ 111,135 |
| | 11/12/2021 | 9,022 | 27,064 (11) | 39.26 | 11/11/2031 | | |
| | 3/4/2022 | 14,601 | 63,271 (2) | 29.91 | 3/3/2032 | | |
| | 3/4/2022 | | | | | 41,176 (13) | $ 3,175,905 |
| Mark Jacobson, M.A. | 4/3/2014 | 24,662 | — | $ 1.30 | 4/3/2024 | | |
| | 6/8/2014 | 13,693 | 6,169 (7) | $ 1.30 | 6/8/2024 | | |
| | 12/29/2014 | 47,739 | — | $ 4.04 | 12/29/2024 | | |
| | 9/15/2015 | 40,673 | — | $ 6.47 | 9/15/2025 | | |
| | 5/27/2016 | 25,000 | — | $ 8.02 | 5/27/2026 | | |
| | 3/15/2017 | 25,000 | — | $ 4.95 | 3/15/2027 | | |
| | 9/13/2017 | 15,000 | — | $ 4.85 | 9/13/2027 | | |
| | 3/12/2018 | 45,378 | — | $ 2.85 | 3/12/2028 | | |
| | 3/19/2019 | 112,223 | 7,481 (3) | $ 12.95 | 3/19/2029 | | |
| | 10/10/2019 | 22,589 | 3,224 (4) | $ 17.61 | 10/10/2029 | | |
| | 3/17/2020 | 33,165 | 15,072 (5) | $ 45.14 | 3/16/2030 | | |
| | 3/17/2020 | | | | | 7,383 (9)(12) | $ 569,451 |
| | 3/05/2021 | 18,217 | 23,421 (10) | $ 65.02 | 3/04/2031 | | |
| | 3/05/2021 | | | | | 16,622 (1) | $ 1,282,055 |
| | 11/12/2021 | 10,410 | 31,228 (11) | $ 39.26 | 11/11/2031 | | |
| | 3/4/2022 | 16,764 | 72,641 (2) | 29.91 | 3/3/2032 | | |
| | 3/4/2022 | | | | | 47,990 (13) | $ 3,701,469 |
| Hunter Murdock, Esq. | 12/13/2021 | 10,000 | 30,000 (6) | 32.55 | 12/12/2031 | | |
| | 12/13/2021 | | | | | 16,690 (14) | $ 1,287,300 |
| | 3/4/2022 | 9,822 | 42,561 (2) | 29.91 | 3/3/2032 | | |
| | 3/4/2022 | | | | | 27,698 (13) | $ 2,136,347 |

(1)  25% of the RSU award vests on the one (1) year anniversary of the date of grant. The remaining RSUs will vest in three substantially equal annual installments such that the RSUs will be fully vested on March 5, 2025. Vested shares will be delivered to the reporting person upon the earlier of (i) the closing of a Change in Control (as defined in the 2015 Plan), (ii) the reporting person's separation of service from Axsome (including termination with or without Cause (as defined in the 2015 Plan), or termination due to death or disability), or (iii) seven (7) years from the date of grant.

(2)  The unexercisable options will vest and become exercisable in equal quarterly installments over four years such that the options will be fully vested on March 4, 2026, provided that the executive continues to provide services to us through the applicable dates.

(3)  The unexercisable options vested and became exercisable in equal quarterly installments over four years such that the options fully vested on March 19, 2023. However, as of December 31, 2022, not all such options had vested, which is why a portion thereof is represented in the "Number of Securities Underlying Unexercised Options Unexercisable (#)" column.

(4)  The unexercisable options will vest and become exercisable in equal quarterly installments over four years such that the options will be fully vested on December 30, 2023, provided that the executive continues to provide services to us through the applicable dates.

(5)  The unexercisable options will vest and become exercisable in equal quarterly installments over four years such that the options will be fully vested on March 16, 2024, provided that the executive continues to provide services to us through the applicable dates.

(6)  The unexercisable options will vest over a four-year period as follows: 25% of the options will vest on the first anniversary of the grant date, and the remaining 75% of the options in equal increments thereafter each quarter of the remaining three years, provided that the executive continues to provide services to us through the applicable dates.

(7)  Performance based equity award based on a clinical development milestone that has not yet been earned.

(8)  Dr. Tabuteau's RSU grant on March 17, 2020 was 51,691 shares, of which 25,846 shares have vested but not settled.

39

TABLE OF CONTENTS

(9)   The RSU award vests in substantially equal annual installments over four years such that the RSU will be fully vested on March 17, 2024. Vested shares will be delivered to the reporting person upon the earlier of (i) the closing of a Change in Control (as defined in the 2015 Plan), (ii) the reporting person's separation of service from Axsome (including termination with or without Cause (as defined in the 2015 Plan), or termination due to death or disability), or (iii) seven (7) years from the date of grant.

(10)   The unexercisable options will vest and become exercisable in equal quarterly installments over four years such that the options will be fully vested on March 5, 2025, provided that the executive continues to provide services to us through the applicable dates.

(11)   25% of the option will start to vest one year from November 12, 2021 and then will vest in substantially equal quarterly installments over three years such that the option will be fully vested on November 12, 2025.

(12)   Mr. Pizzie's and Mr. Jacobson's RSU grant on March 17, 2020 was 14,767, of which 7,384 shares have vested but not settled.

(13)   25% of the RSU award vests on the one (1) year anniversary of the date of grant. The remaining RSUs will vest in three substantially equal annual installments such that the RSUs will be fully vested on March 4, 2026. Vested shares will be delivered to the reporting person upon the earlier of (i) the closing of a Change in Control (as defined in the 2015 Plan), (ii) the reporting person's separation of service from Axsome (including termination with or without Cause (as defined in the 2015 Plan), or termination due to death or disability), or (iii) seven (7) years from the date of grant.

(14)   Mr. Murdock's RSU grant on December 13, 2021 was 22,254 shares, of which 5,564 shares have vested but not settled.

## 2022 Option Exercises and Stock Vested

The following table contains information for our NEOs concerning the option awards that were exercised and RSUs that were vested during the fiscal year ended December 31, 2022:

| Name | Option Awards | | Stock Awards | |
| --- | --- | --- | --- | --- |
| | Number of Shares Acquired on Exercise | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting | Value Realized on Vesting ($) |
| Herriot Tabuteau, M.D. | — | $ —(1) | 25,852 | $ —(2) |
| Nick Pizzie, C.P.A., M.B.A. | — | $ —(1) | 8,494 | $ —(3) |
| Mark Jacobson, M.A. | — | $ —(1) | 9,233 | $ —(4) |
| Hunter Murdock, Esq. | — | $ —(1) | 5,564 | $ —(5) |

(1)   No options were exercised during the year ended December 31, 2022.

(2)   Dr. Tabuteau's stock awards were valued at $828,414 as of the vesting dates on March 5 and March 17, 2022. However, the shares are subject to a post-vesting holding period, and therefore, the actual realized value may be higher or lower.

(3)   Mr. Pizzie's stock awards were valued at $269,821 as of the vesting dates on March 5 and March 17, 2022. However, the shares are subject to a post-vesting holding period, and therefore, the actual realized value may be higher or lower.

(4)   Mr. Jacobson's stock awards were valued at $291,924 as of the vesting dates on March 5 and March 17, 2022. However, the shares are subject to a post-vesting holding period, and therefore, the actual realized value may be higher or lower.

(5)   Mr. Murdock's stock awards were valued at $442,060 as of the vesting date on December 13, 2022. However, the shares are subject to a post-vesting holding period, and therefore, the actual realized value may be higher or lower.

## Potential Payments Upon Termination/Change of Control and Employment Agreements

The following table sets forth information regarding payments that would have been made to our NEOs if they suffered an involuntary termination without cause, including a termination in connection with a change of control, and such termination payments were triggered on December 31, 2022. The closing price per share of our common stock on Nasdaq on December 31, 2022 was $77.13. As described above, only Mr. Pizzie has entered into an employment agreement with the Company which provides for severance payments.

| Name | Termination Without Cause in Connection with Change in Control | | Termination Without Cause | |
| --- | --- | --- | --- | --- |
| | Salary and Bonus ($) | Equity Acceleration ($) | Salary and Bonus ($) | Equity Acceleration ($) |
| Herriot Tabuteau, M.D. | $ —(1) | $ 118,491,686(2) | $ —(1) | $ —(2) |
| Nick Pizzie, C.P.A., M.B.A. | $ 225,500(3) | $ 28,895,789(2) | $ —(3) | $ —(2) |
| Mark Jacobson, M.A. | $ —(1) | $ 34,445,518(2) | $ —(1) | $ —(2) |
| Hunter Murdock, Esq. | $ —(1) | $ 10,978,299(2) | $ —(1) | $ —(2) |

*   Pursuant to the 2015 Plan, any acceleration of the equity awards granted to non-exempt employees upon the employee's death, disability or retirement would be at the discretion of the Compensation Committee.

(1)   Dr. Tabuteau, Mr. Jacobson, and Mr. Murdock will not receive any severance payments upon an involuntary termination without cause, including a termination in connection with a change of control.

(2)   The 2015 Plan includes a double-trigger provision, whereby the unvested portion of each NEO's outstanding equity awards shall become immediately vested and exercisable upon such NEO's termination without cause in connection with a Change in Control (as defined in the 2015 Plan). The 2015 Plan does not otherwise provide for acceleration of equity in connection with a termination for any other reason or a termination without cause not in connection with a Change in Control.

(3)   Mr. Pizzie's employment agreement includes a double-trigger provision, whereby Mr. Pizzie will receive a severance payment equal to six months of his then-base salary for termination without cause in connection with a Change in Control. His employment agreement does not provide for severance payments in connection with a termination without cause not in connection with a change in control.

40